2000 OK CIV APP 32

**Erica SICKING,**
**Plaintiff/Appellee/Counter–Appellant,**

v.

**James D. SICKING, Jr., Defendant/Appel-lee/Counter–Appellee, and James D. Sicking and Gloria J. Sicking, Interve-nors/Appellants/Counter–Appellees.**

No. 91490.

Court of Civil Appeals of Oklahoma,
Division No. 1.

Aug. 27, 1999.

Rehearing Denied Oct. 15, 1999.

Certiorari Denied Feb. 16, 2000.

Jack R. Givens and Blake R. Givens, Jones, Givens, Gotcher & Bogan, P.C., Tulsa, Oklahoma, and Sam P. Daniel and Ron W. Little, Doener, Saunders, Daniel & Anderson, L.L.P., For Plaintiff/Appellee/Tulsa, Oklahoma,Counter–Appellant.

Michael E. Staggs, Howard, Widdows, Bufogle & Vaughn, P.C., Tulsa, Oklahoma, For Defendant/Appellee/ Counter–Appellee.

Sharon L. Corbitt, Corbitt, Rineer & Johnson, P.C., Tulsa, Oklahoma, and Brian S. Gaskill, Sneed Lang, P.C., Tulsa, Oklahoma, For intervenors/Appellants/Counter–Appellees.

OPINION

ADAMS, Judge:

¶1 Erica Sicking, now Erica Dorwart, (Mother) and James D. Sicking, Jr., (Father) married on April 30, 1996. Mother filed for divorce approximately three months later, and an agreed divorce was entered in November of 1996. At the time of the divorce, Mother was pregnant. The divorce decree reserved the issue of paternity and other child-related issues for future resolution. Animosity between Mother and Father continued after their daughter, C, was born the following February, and visitation became a point of contention. Father's parents, James D. Sicking and Gloria J. Sicking (Grandparents, or, as appropriate, Grandmother or Grandfather) also filed a petition to intervene in the divorce and asked for visitation with their granddaughter.

¶2 Following hearings held on five days over a three month period, the trial court entered a series of orders placing primary custody of C with Mother, ordering Father to pay child support, and giving Father visitation for two hours on Tuesday and Thursday of each week and an additional two hours on alternating Saturdays. The trial court also ordered that Grandparents would be allowed to visit C once every two weeks *in conjunction with Father's visitation* or without Father *if Father was unable to exercise his visitation time.* However, the trial court also ordered that C could not be a passenger in a vehicle being driven by Grandmother, and that Grandmother could visit with C only in the presence of Father or Grandfather.

¶3 Mother, Father, and Grandparents filed separate applications for attorney fees and costs. After hearing, the trial court ordered Father to pay a portion of Mother's attorney fees, ordered Mother to pay a portion of Father's attorney fees, and denied Grandparents' request to have Mother pay all or part of their attorney fees, concluding such an award was not authorized.

¶4 Grandparents appealed the order denying their request for attorney fees. Mother filed a counter-appeal seeking reversal of the order allowing Grandparents to have visi-

tation with C and the order requiring her to pay a portion of Father's attorney fees.

## GRANDPARENTS' APPEAL

¶ 5  As noted in *Walden v. Hughes*, 1990 OK 105, ¶ 2–3, 799 P.2d 619, "Oklahoma follows the general rule that attorney fees are generally not recoverable unless so provided by statute or enforceable contract `...` This court, creating an exception to the general rule, has held that a court has the equitable power to award attorney fees in cases where 'an opponent has acted in bad faith, vexatiously, wantonly or for oppressive reason.'" (Citations omitted.) This equitable exception was first recognized in *City National Bank & Trust Company v. Owens*, 1977 OK 86, 565 P.2d 4.[1]

¶ 6  Grandparents first argue that the trial court was authorized to award attorney fees by 43 O.S.Supp.1997 § 110(C). Mother contends § 110 does not authorize an attorney fee award to an intervenor in a divorce case. Our resolution of this dispute must be found in the language of the section. The governing principle in statutory construction is legislative intent. *City of Chandler v. State ex rel. Department of Human Services*, 1992 OK 137, 839 P.2d 1352. Words or phrases are to be understood in the context of all of the statute. *Matter of Estate of Little Bear*, 1995 OK 134, 909 P.2d 42. Statutory construction is not necessary if the legislative intent is clearly expressed, *Matter of Estate of Flowers*, 1993 OK 19, 848 P.2d 1146. If legislative intent is clearly expressed, the ordinary meaning of the statutory language will control, *Oklahoma Association for Equitable Taxation v. City of Oklahoma City*, 1995 OK 62, 901 P.2d 800, *cert. denied*, 516 U.S. 1029, 116 S.Ct. 674, 133 L.Ed.2d 523.

¶ 7  Such clarity exists here. Section 110(C) provides, in pertinent part, that the trial court "may require *either party* to pay such reasonable expenses *of the other* as may be just and proper under the circumstances." (Emphasis added.) Grandparents' interpretation of § 110(C) would require us to substitute the word "any" for "either" and the phrase "of any other party" for "of the other." It is apparent § 110(C) contemplates but two parties, the divorcing husband and wife, and does not provide for an award of attorney fees and costs under the circumstances at hand.

¶ 8  Citing only *Blackwell Livestock Auction, Inc. v. Community Bank of Shidler, Oklahoma*, 1993 OK CIV APP 161, 864 P.2d 1297, Grandparents argue that "[a] court has the authority to award attorney fees in an action in equity." *Blackwell* was an action to enforce an equitable lien, and attorney fees are allowed by statute to "the party for whom judgment is rendered" in actions to enforce "any lien." 42 O.S.1991 § 176. *Blackwell* does not stand for the proposition urged by Grandparents, *i.e.*, that a court sitting in equity may always award attorney fees to a party. Such a holding would be in direct conflict with *Walden*, an equitable action, where the Court concluded the prevailing party could not be awarded attorney fees. Under the circumstances of this case, Grandparents were not entitled to attorney fees on any ground urged by them in this appeal.

## MOTHER'S COUNTER–APPEAL

### *Grandparental Visitation*

### Constitutional Question

¶ 9  Relying on *In the Matter of Herbst*, 1998 OK 100, 971 P.2d 395, Mother contends 10 O.S.Supp.1996 § 5 may not be constitutionally applied to afford Grandparents "independent" visitation because they did not show a harm, or threat of harm, to C if Grandparents do not have such "independent" visitation.[2] In addressing this argu-

---

1. Although Grandparents contend on appeal that the trial court had the equitable power to award attorney fees, they do not cite *Owens* or any of its progeny and appear to rely on what they perceive as a trial court's ability to do so when sitting as a court of equity rather than on any "bad faith" or "vexatious" litigation tactics by Mother.

2. Grandparents argue Mother waived any constitutional challenge to grandparental visitation. However, the record supports the conclusion that the issue was preserved for appellate review.

ment it is critical to recognize the important differences between the facts of this case and *Herbst.*

¶ 10 This case does not involve an intact nuclear family where both parents object to visitation by the grandparent. It does not even involve a divorce where both parents object to visitation by the grandparent, and it does not involve a divorce where a grandparent is given visitation in addition to that given to the non-custodial parent, thus invading time that would otherwise be available for the child to be with the custodial parent. *Herbst* has already decided that in the first circumstance, § 5 cannot be constitutionally applied absent harm or the threat of harm. We need not, and do not, decide in this case whether § 5 may be constitutionally applied in the latter two circumstances.

■ ¶ 11 The narrow issue presented here is whether § 5 is unconstitutionally applied when the parents of a non-custodial parent involved in a divorce case are given "independent" rights to visit with their grandchild, with the support and the approval of the non-custodial parent, during the time which would otherwise be used by the non-custodial parent for visitation with the child and the non-custodial parent is unable to exercise that visitation.[3] We conclude that it is not.

¶ 12 According to Mother, *Herbst,* 1998 OK 100, ¶ 18, 971 P.2d at 398, prohibits court-imposed grandparental visitation in this case because "[a]bsent a showing of harm, (or threat thereof) it is not for the state to choose which associations a family must maintain and which the family is permitted to abandon." Mother's reliance dismisses language immediately preceding that quotation that requires a "showing of harm, or threat of harm, to bring the issue before the court *or some instance of death or divorce which brings the child's domestic situation within the provence of the court."* (Emphasis added.) Mother says this is appropriate because the emphasized language "implies only the legal context in which the

questions of harm or threat to the child's well being arises." According to Mother, even where the parents of the child are divorced, some threatened harm is necessary before the court may require a parent to allow a grandparent to visit with the child. We disagree.

¶ 13 The language chosen by the Court makes it clear that its decision does not impact the application of § 5 in cases involving divorced or divorcing parents. Moreover, one of the principal decisions relied upon in *Herbst* explicitly recognized "the termination of the relationship between the child's parents" as being an instance where "state interference with parental rights to custody and control of children is permissible" because "the health or welfare of a child is threatened." *Brooks v. Parkerson,* 265 Ga. 189, 193, 454 S.E.2d 769, 772 (1995).

¶ 14 Father supported Grandparents' request for visitation, and it is "his" time which Grandparents will use to foster a relationship with their grandchild. Mother has not presented us with any authority which would give her the unilateral veto she seeks over the relationships which C will be allowed to enjoy. The right protected in *Herbst* is a right enjoyed by both parents. If Father chooses to foster a relationship between his parents and C by allowing them to visit with C, either with or without Father, during times when Father would ordinarily visit with C exclusively and such visitation is in C's best interest, Mother has no constitutional right to prevent it.

### Presumption

■ ¶ 15 Before ruling on a dismissal motion made by Mother at the close of Grandparents' evidence, the trial court commented, "I have to believe that there's some sort of presumption that ... where grandparents have a relationship with the child, that it is their right to continue that relationship." Mother argues that the trial court thereby improperly placed on her the burden of proving that visitation was not in the

---

**3.** Mother apparently does not now object to Grandparents visiting with C during Father's visitation times, so long as Father accompanies them and the other limitations imposed by the

trial court are followed. Her argument focuses on Grandparents' ability to visit with C during Father's normally scheduled times when Father is unable to do so.

child's best interest. According to Mother, this is contrary to the explicit provisions of § 5 which give grandparents a "right" to visitation only upon a showing that such visitation is in the child's best interest.

¶ 16 Even if we were to agree with Mother that no such "presumption" exists and that its use would improperly shift the burden of proof, which we do not decide, it is clear from the trial court's own words that no presumption was applied, because the trial court also explicitly found that the *sine qua non* for the establishment of the presumption, "where grandparents have a relationship with the child," did not exist.[4] Any error of the trial court in concluding that a presumption might exist under the statute if the grandparents had established a relationship with the child was harmless and cannot be the basis of reversal. *Wat Henry Pontiac, Inc. v. Pitcock*, 1956 OK 230, 301 P.2d 203.

### Best Interest

¶ 17 Without question, even where § 5 may be constitutionally applied, grandparental visitation is appropriate only where that visitation is in the child's best interest. Moreover, this section requires the trial court to specifically consider several factors in making that determination. However, custody and visitation are matters of equity, and they are left to the sound discretion of the trial court. *Kahre v. Kahre*, 1995 OK 133, 916 P.2d 1355, and "[t]he trial court is entitled to choose which testimony to believe as the judge has the advantage over this Court in observing the behavior and demeanor of the witnesses." *Mueggenborg v. Walling*, 1992 OK 121, ¶ 7, 836 P.2d 112. The trial court's ruling will not be disturbed upon

appeal unless it is against the clear weight of the evidence, *Kahre*, and the one who alleges error in the trial court's determination on visitation puts forth the evidence relied upon and affirmatively shows how the determination is contrary to the best interest of the child. *See Gorham v. Gorham*, 1984 OK 90, 692 P.2d 1375.

¶ 18 Clearly, Mother disagrees with the trial court's assessments of some of the evidence. In addition to the testimony of the parties, the trial court heard testimony and received reports from several expert witnesses concerning visitation. This record contains evidentiary materials and testimony which, if given credence, support the trial court's determinations that C's best interest is served by allowing Grandparents visitation. The record also shows the trial court applied the factors listed in § 5(B) when determining if C's best interest was served by allowing visitation.[5] Mother has not affirmatively shown that the determinations of the trial court regarding C's best interest are clearly against the weight of the evidence.

### Procedural Error

¶ 19 Mother argues the trial court should have allowed her to personally read and review Grandmother's psychological reports and personal journal so she could assess Grandmother's physical and psychological fitness to exercise visitation, arguing that she was thereby denied "the right to fully participate in her defense of the [Grandparents'] attempt to gain full non-custodial rights to Mother's child." Mother's counsel was able to inspect the reports and journal, but she did not have physical access to

---

4. In the very next sentence following the "presumption statement" the trial court said, "In this particular case, these grandparents do not have a relationship with the child that needs to be continued, because they have not been allowed to establish one for whatever reason. So this Court does not find that to be determinative in this case." Later in the proceedings, the trial court noted, "I would divine that there is no independent right to the grandparents."

5. According to 10 O.S.Supp.1996 § 5(B):

In determining the best interest of the minor child, the court shall consider:

1. The willingness of the grandparent or grandparents to encourage a close relationship between the child and the parent or parents;
2. The length and quality of the prior relationship between the child and the grandparent or grandparents;
3. The preference of the child if the child is determined to be of sufficient maturity to express a preference;
4. The mental and physical health of the child;
5. The mental and physical health of the grandparent or grandparents; and
6. Such other factors as are necessary in the particular circumstances.

them.[6] Mother's counsel was able to tell her about the materials' contents and had marked portions he found relevant to the litigation for use during trial. Mother was able to voice her opinions about Grandmother's fitness for visitation. Mother has not shown how she was prejudiced by failing to be able to personally read the materials rather than relying upon the assessments given by her own counsel and by experts questioned about the significance of their contents, and she may not obtain reversal without showing such prejudice.

### Attorney Fees

■ ¶ 20 Mother argues that the trial court erred in awarding Father attorney fees.[7] Mother argues the trial court improperly based its award of fees upon financial support Mother received from her parents and her speculative future employment. In making the decision on attorney fees, the trial court did note that Mother was "currently a student living with her parents, who are defraying all her expenses," that she was in her third year of law school, and that she ranked near the top of her class. The trial court also noted Father's gross monthly income. However, the trial court clearly based its decision on factors other than the ability to pay.

¶ 21 In its January 26, 1998 Order, the trial court found that, according to an expert's testimony, Mother "does not support visitation between [Father] and the minor child" and based upon "insufficient reason" terminated Father's visitation on September 17, 1997. The trial court found Mother had

alleged Father had a "drinking problem," but the allegation was not supported by the evidence presented. Mother did not advise Father of the child's birth and "caused the hospital not to report the birth" in the newspaper.

¶ 22 The trial court's ruling on attorney fees finds that Mother retained an expert to make a visitation recommendation and Father agreed to abide by that recommendation. The expert made the recommendation on June 26, 1997, but Mother refused to accept it. The trial court found that Father had incurred $14,833.75 in attorney fees since the rendition of the recommendation and that his agreement to follow the recommendation was reasonable. The trial court also determined that Mother's "posture regarding [Father's] visitation was unreasonable" and that she had acted arbitrarily and capriciously, "and exacerbated the litigation" by refusing to allow Father visitation in excess of thirty minute periods, refusing to allow him to bring Grandparents for a visit, and in terminating Father's visitation in September of 1997. The trial court noted "the level of acrimony in this case from [Mother] to [Father] is unprecedented for a marriage that only lasted two months."

¶ 23 The trial court then ordered Mother to pay Father $9,790.27, which was identified as two-thirds of the amount he incurred after June 26, 1997. That amount was net of reductions of $1,221 and $1,175, the amounts, respectively, which Mother requested in a fee application and which Father had expended earlier in the litigation when he questioned paternity.

---

6. An agreed protective order regarding Grandmother's medical records, including items such as notes and files, and all interrogatories, depositions and the like quoting or summarizing those medical resources was entered on October 2, 1997. The order provided that the materials could be disclosed by counsel to their clients, but "[n]o copies of any such documents shall be disseminated to parties, or retained by them, other than to a party whom such medical records pertain; but counsel alone may retain a copy thereof in their files for purposes of appeal, retrial, future modification or for purposes provided in paragraph 7 hereof." Paragraph 7 limited use of information from the confidential or privileged documents under the order to preparation and trial, including appeals or retrial, and to diagnosis, treatment or care of C.

7. We do not consider Mother's claims that the trial court improperly denied "virtually all of ... Mother's application for attorneys fees against [Father]" because the record does not show Mother requested any attorney fee award against Father other than her fees incurred during the period he was denying paternity, all of which the trial court awarded to her. Further, we do not consider Mother's contingent argument that she should have received attorney fees against Grandparents if we were to decide 10 O.S.Supp. 1996 § 5 allows an attorney fee to the prevailing party. Mother took the position in the trial court that § 5 did not allow such fees, and on appeal, Grandparents have abandoned any argument for fees based on § 5.

¶ 24 Mother's analysis of what is just and reasonable under the circumstances focuses upon ability to pay. Here, the trial court found that Mother had acted in an arbitrary and capricious manner and exacerbated the litigation. As noted by the Court in *Thielenhaus v. Thielenhaus*, that "[w]idespread courthouse folklore—that either the *nonprevailing party* in the case or the *principal spousal provider* is under a duty to pay counsel fees in matrimonial litigation—is *not* the law in Oklahoma. *It is a hard-to-repress legal myth.*" (Emphasis in original). 1995 OK 5, ¶ 19, 890 P.2d 925, 934. Attorney fees must be granted only to litigants who qualify for the benefit through the process of a judicial balancing of the equities.

¶ 25 There is no abuse of discretion in requiring Mother to pay the attorney fees she actively participated in creating, just as there was no abuse in ordering Father to bear the cost of fees his actions caused to be incurred. The determination of whether and how to assess attorney fees in this kind of action is addressed to the sound discretion of the trial court. We will not modify its decision absent a showing of abuse of discretion, *Wood v. Wood*, 1990 OK CIV APP 49, 793 P.2d 1372, and that showing is not made in this record.

## CONCLUSION

¶ 26 The trial court did not err in refusing to award attorney fees to Grandparents. Mother has not demonstrated any error of law in the visitation order or that the order should be disturbed because it was against the clear weight of the evidence or was an abuse of discretion. Moreover, the trial court's order requiring Mother to pay a portion of Father's attorney fees was not an abuse of discretion. The trial court's orders are affirmed. Father's request for appellate attorney fees is denied.

¶ 27 AFFIRMED

¶ 28 HANSEN, P.J., and JONES, C.J., concur.