2009 OK 93

John MURRELL and Elvia Murrell, Appellees,

v.

Mychal COX, Appellant.

and

Mychal Cox, Petitioner,

v.

Honorable Charles Gray, Associate District Judge, McClain County, Respondent.

Nos. 106,814, 107,579.

Supreme Court of Oklahoma.

Dec. 15, 2009.

John W. Turner, Turner Law Firm, P.L.L.C., Oklahoma City, OK, for Mychal Cox.

Ronald R. Boone, Boone Law Office, Norman, OK, for John & Elvia Murrell.

COLBERT, J.

¶ 1 This opinion resolves an appeal, No. 106,814, and an original proceeding, No. 107,-579, in which original jurisdiction was previously assumed by an order that stated this opinion was to follow. These matters are controlled by a proper appreciation of the

rights of a parent and the rights provided to grandparents under Oklahoma's grandparent visitation statute in relation to the best interests of the child when determining physical custody of a minor. From the record presented and the arguments of the parties, this Court concludes that the trial court has exceeded its authority and abused its discretion.

## FACTS AND PROCEDURAL HISTORY

¶2 On March 18, 2005, Mychal Cox (Mother) gave birth to her son, M.I.M. Mother was eighteen years old and her boyfriend, Aldryn Murrell (Father), was twenty. Mother and Father were never married.

¶3 During the first six months of M.I.M.'s life, the child and his parents resided with John and Elvia Murrell (Paternal Grandparents). M.I.M. and his parents then moved into an apartment. This arrangement ended when M.I.M. was ten months old. Father returned to live with Paternal Grandparents while M.I.M. remained with his mother. Mother began dating Chris Kessee, who is currently her fiancé and the father of her second child, C.K., born September 1, 2007.

¶4 On October 10, 2006, when M.I.M. was nineteen months old, Paternal Grandparents petitioned for temporary custody and appointment as co-guardians of the child. Father consented to the guardianship. A hearing was held and the trial court determined Mother to be unfit on November 7, 2006, finding:

> The evidence showed that the mother has never exercised proper parenting skills concerning the minor child; that the mother is using alcohol and has exhibited a violent temper on several occasions; that the child has lived 50%–60% of the time since his birth on March 18, 2005 with Petitioners in their home; that the natural mother "disappears for days at a time leaving the child with Petitioners on the pretext of going to Sonic, etc."; that the mother's own testimony and other evidence indicates that she is immature and unrealistic about parenting issues.

The trial court "recommended" that "if the natural mother and father become serious about being parents to the minor child" they should:

a. Complete parenting classes;

b. Complete the Child In the Middle course, or a similar program;

c. Refrain from the use of alcohol or illicit drugs;

d. Maintain a steady job;

e. Maintain stable, appropriate housing;

f. Consider individual counseling.

Mother was granted day-time unsupervised visitation every other Saturday and Sunday with additional visitation "encouraged," but no overnight visitation was allowed.

¶5 On January 25, 2007, Mother filed an Application for Termination of Guardianship asserting that she had completed the requirements and recommendations of the trial court and had thereby become a fit parent who was entitled to restoration of her parental rights. While the application was pending, Mother moved for the appointment of a guardian ad litem for the child and an agreed order was entered granting Mother overnight visitation with her son.

¶6 A hearing was held on March 19, 2007, before Judge Charles Gray who was assigned to the matter following the retirement of the previous judge, Noah Ewing. The trial court made no finding as to Mother's fitness. Rather, it commended her on her progress and recommended family counseling. Denying the application, the trial court stated: "I think you've got to consider the separation anxiety of the child being ripped from the living quarters where he is currently living and, apparently has been living for a period of time." The trial court noted the pending motion for appointment of a guardian ad litem but did not make a ruling at that time.

¶7 Mother sought again to terminate the guardianship by an application filed on July 10, 2007. The matter was set for hearing and then continued over Mother's objection. A trial was ultimately scheduled for November 13, 2007. However, on October 26, 2007, Father filed a Petition for Establishment of Custody, Visitation and Child Support seeking termination of the guardianship and cus-

tody of his son.[1] The petition noted that paternity had been judicially determined in the guardianship action. Father's petition was assigned a new case number.

¶ 8 On November 13, 2007, the trial court held a hearing in the guardianship action on Mother's application to terminate the guardianship. Making no determination as to the fitness of Mother, the trial court "continued and consolidated" the guardianship action with Father's custody action. Legal custody remained with the guardians and each parent was granted alternating weekly visitation. A guardian ad litem for the child was appointed. Father continued to live with Paternal Grandparents.

¶ 9 On December 28, 2007, Father filed an Application for Emergency Temporary Order and Suspension of Visitation alleging that Mother had injured M.I.M. Father sought an *ex parte* order by which Mother's visitation would be suspended. That same day, the Department of Human Services (DHS) received an allegation of harm to M.I.M. and concern for the welfare of his four-month-old half brother. A DHS report dated February 1, 2008, found that no abuse had been substantiated. It recommended parenting classes specific to parenting children from divorce and/or custody disputes for all the parties and counseling from an objective counselor not connected to either family for M.I.M.

¶ 10 The Guardian Ad Litem Report was filed on January 14, 2008. It recommended that both parents were fit and that the guardianship should be terminated immediately. The report further recommended that custody be awarded to Mother with alternating weekly visitation by Father.

¶ 11 Father's application for an emergency order was denied on March 7, 2008. A hearing on Mother's application to terminate the guardianship was repeatedly continued until September, 2008. On June 18, 2008, another allegation of child abuse was referred to

DHS.[2] The DHS investigation report concluded that abuse could not be confirmed and no services were recommended.

¶ 12 By the time a hearing was held on September 18, 2008, the Paternal Grandparents and the parents had agreed to terminate the guardianship. The trial court signed an order memorializing that agreement. Issues of custody, visitation, and child support were continued to October 7, 2008. At that time, Mother and Father agreed to joint custody, alternating weekly between the parents, following a three-month transition period during which each parent would have alternating custody for two days of each week. The trial court ordered family counseling to occur at least once a week. No finding was made as to the fitness of either parent.

¶ 13 Within days of the October 7, 2008, hearing, Father moved from his parents' home and rented an apartment. On October 12, 2008, he committed suicide. Mother asserts she requested physical custody of M.I.M. and that Paternal Grandparents refused. Mother sought a writ of habeas corpus in the trial court. Paternal Grandparents appeared and filed an Application for Emergency Temporary Order to enforce the three-month transition period ordered the previous week. They also filed a Petition for Grandparental Visitation seeking "reasonable visitation" pursuant to title 10, section 5, of the Oklahoma Statutes,[3] citing "disruption of the nuclear family" and "the best interests of the child." The trial court noted that legal custody became vested solely in Mother upon Father's death but denied Mother's request for immediate physical custody of her child. Instead, the trial court enforced the "transition period" as "temporary grandparental visitation." There is nothing in the appellate record to indicate that evidence was presented or testimony received at the hearing concerning any request by a party. Further hearing was set for January 13, 2009.

---

1. Counsel who filed Father's petition is the same lawyer who represented Paternal Grandparents and continues to represent them.

2. Mother states that Paternal Grandmother is a DHS employee and that she has systematically used her familiarity with the system to impede reunification of M.I.M. with Mother.

3. The provision was re-codified in 2009. *See* Okla. Stat. tit. 43, § 109.4 (Supp.2009).

¶ 14 During the three-month court-ordered transition period, Mother brought an Application to Assume Original Jurisdiction and Petition for Writ of Mandamus and/or Habeas Corpus in this Court on November 25, 2008, in No. 106,557. Mother sought the return of her son to her physical custody. This Court declined to assume original jurisdiction in the premature action.

¶ 15 On January 19, 2009, the trial court held an evidentiary hearing and received evidence on the issue of whether Paternal Grandparents had demonstrated the statutory criteria for court-ordered grandparent visitation. M.I.M. was nearly four years old at the time of the hearing. Along with the testimony of Paternal Grandmother, Paternal Grandparents offered expert testimony from a clinical social worker who had been counseling the child at their request following Father's suicide. The counselor testified that the "goal of the child's therapy" was to "resolve the grieving for his biological father." She opined that a transition period should not begin until the child completed the process of grieving for Father. She could not offer any guidance as to when that might occur. The counselor objected to any change in custody or visitation until the grieving process was completed.

¶ 16 On cross examination, the counselor was asked why she had counseled the child over a period of six weeks without the knowledge or consent of Mother. The counselor replied that she had been "remiss." She agreed with the "goal" of reunification of the child with Mother, but repeated her opinion that it should happen only after completion of the child's grieving.

¶ 17 Paternal Grandmother testified that she had become concerned Mother was returning to the conduct that necessitated the guardianship in 2006. She was generally critical of Mother's ability to provide medical care and counseling for M.I.M. However, in closing argument counsel for Paternal Grandparents stated that they did not wish to seek a guardianship.

¶ 18 At the conclusion of the hearing, the trial court noted the absence of an amicable relationship between Mother and Paternal Grandparents. It went on to reference cases from the United States Supreme Court concerning parental rights, apparently the ones cited in Mother's motion to dismiss Paternal Grandparents' request for visitation.[4] The trial court stated: "I know the United States Supreme Court has, in my opinion, done a great injustice to families of the United States by the decision they made, but I am a person in Purcell, Oklahoma and they are the Supreme Court and their law governs." The trial court then announced that Paternal Grandparents had met their burden of demonstrating that the child would suffer harm if grandparent visitation were withheld and ordered the status quo as to custody pending a written decision.

¶ 19 Ten days later, the trial court issued its Order Granting Grandparental Visitation. The order noted that "the issue of fitness or unfitness was not specifically addressed during the hearing" but the trial court "questions Mother's fitness" for "refusing to provide the child with needed counseling." The order went on to conclude that Mother was likely to withhold visitation from Paternal Grandparents if visitation were not ordered by the court and that the child would suffer psychological harm. The order then set out the evidence of the comparative moral fitness of Mother's home versus the home of Paternal Grandparents[5] and ordered "visitation"

4. Along with decisions of this Court, the motion to dismiss cited *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), for the proposition that the parent-child bond has been recognized as a fundamental and constitutionally protected right. It also cited *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), for the proposition that grandparent visitation should be left to a fit parent's discretion.

5. The order provided:

That the moral fitness of the parties factor set forth in 10 O.S.A. § 5(E)(1)(k) was indirectly addressed during these proceedings wherein testimony was presented by the mother that she does not attend church, has had a second child out of wedlock and is cohabitating with an individual not her husband. The Court finds the mother's claim that she has not married due to the interference by the grandparents and court system to be without merit and damaging to the credibility of the mother.

in accordance with that previously ordered. The order granted visitation for two days of each week. However, the visitation previously ordered was for *Mother* to have two days of visitation. Under the order, Paternal Grandparents were granted five days of "visitation" each week. That arrangement persists to this day. Mother brought an appeal from the order in No 106,814.

¶ 20 While the appeal was pending, Paternal Grandparents filed a new action in the trial court in an effort to gain legal custody of M.I.M. pursuant to section 112.5 of title 43, of the Oklahoma Statutes based on non-support by a non-custodial parent. The trial court granted summary judgment to Mother on July 8, 2009, because "Mother [is] not 'non-custodial' parent thus grounds for relief fail as a matter of law." Mother asserts that a third allegation of child abuse against her was initiated by Paternal Grandparents, investigated by the DHS, and "found to be without merit."

¶ 21 In August, 2009, Mother enrolled M.I.M. in a pre-k program in the Tuttle Public Schools and notified the child's counselor and Paternal Grandparents, who opposed the action. Mother filed an Emergency Motion to Prevent Grandparent Interference with School Attendance and to Expedite Parenting Time. The trial court held a hearing on September 9, 2009. Paternal Grandparents' expert appeared and opined that the child's physical custody should not be altered until the child had completed the grieving process for Father. Again, the counselor would offer no estimate as to when that might occur. The counselor also recommended that M.I.M. remain at his daycare, rather than entering a pre-k program, in order to "simplify" his life. On cross-examination, the counselor admitted that she was under the assumption that Paternal Grandparents and Mother had "joint custody." This was incorrect, of course, because Paternal Grandparents were no longer legal custodians following the termination of the guardianship. Additionally, the trial court never determined

whether Mother was entitled to physical custody, only that Mother was the sole legal custodian. The trial court noted the two days per week provided in the grandparent visitation order would eventually be for the Paternal Grandparents rather than for Mother but determined that "it [was] not in the best interests of [the] minor child to proceed with [reunification at a] pace not recommended by [the] professional counselor."

¶ 22 Mother brought an Application to Assume Original Jurisdiction and Petition for Writ of Mandamus and/or Habeas Corpus in this Court on September 25, 2009, in No. 107,579. The petition asks this Court to order the trial judge to: (1) place physical custody of M.I.M. with Mother, (2) formulate a plan of transition for the return of physical custody to Mother, and (3) refrain from interfering with Mother's decision to enroll M.I.M. in a pre-k program at Tuttle Public Schools. This Court assumed original jurisdiction by an order of October 26, 2009, which stated that an opinion was to follow. This opinion addresses the appeal of the trial court's grandparent visitation order and the original action.

## STANDARD OF REVIEW

¶ 23 This Court will assume original jurisdiction and grant extraordinary relief when the trial court has exceeded its authority. *Heffron v. District Court,* 2003 OK 75, ¶ 3, 77 P.3d 1069, 1073 ("extraordinary relief is available to prevent or remedy the unauthorized use of judicial force when the trial court has attempted to exercise judicial power or authority not authorized by, and contrary to law"). The performance of a judicial duty involving a child's custodial placement may be compelled by mandamus. *See generally, McDonald v. Wrigley,* 1994 OK 25, 870 P.2d 777. A trial court's determination of the amount of "reasonable visitation" to which a grandparent is statutorily entitled is measured by the "abuse of discretion" standard. *See McGuire v. Morrison,* 1998 OK CIV APP 128, ¶ 9, 964 P.2d 966, 969.

---

The moral fitness factor as regards grandparents was proven to be that the grandfather is a pastor of a church and the child attends regularly with the grandparents and the grandparents maintain a marital relationship wherein the child has resided most of his life.

ANALYSIS

¶ 24 This matter cannot be resolved properly without acknowledgment that "the relationship of parents to their children [is] a fundamental constitutionally protected right." *In re Chad S.,* 1978 OK 94, ¶ 12, 580 P.2d 983, 985 (citing *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). That right may not be infringed upon absent a compelling state interest. *In re Herbst,* 1998 OK 100, ¶ 10, 971 P.2d 395, 397. "This Court has consistently held that the right of a parent to the care, custody, companionship and management of his or her child is a fundamental right protected by the federal and state constitutions." *In re Grover,* 1984 OK 20, ¶ 9, 681 P.2d 81, 83. Judicial determinations of custody and visitation constitute state action and the State's interest in making such determinations must be sufficiently compelling to warrant invasion. *See Herbst,* 1998 OK 100, ¶ 14, 971 P.2d at 398–399. "[P]rotecting the child from harm is the requisite State interest." *In re Sherol A.S.,* 1978 OK 103, ¶ 22, 581 P.2d 884, 888. To deprive a parent of legal custody of a child in favor of third parties, the parent's unfitness must be demonstrated by clear and compelling evidence. *In re M.R.S.,* 1998 OK 38, ¶ 14, 960 P.2d 357, 362. "[S]uch 'unfitness' must be positive and not comparative." *Id.* "The fact that a child might be better cared for by a third party is not sufficient reason for depriving a parent of custody of his or her child." *Id.* Unfitness must be demonstrated "only by a showing that the parents cannot reasonably be expected to provide for the child's ordinary comfort or intellectual and moral development." *McDonald v. Wrigley,* 1994 OK 25, ¶ 12, 870 P.2d 777, 781.

¶ 25 "Grandparents have no constitutional right to custody of or visitation with their grandchildren. Such rights are limited to those conferred by statute." *Grover,* 1984 OK 20, ¶ 12, 681 P.2d at 83. "[A] grandparent's right to visitation is not co-equal with that of a parent." *McGuire v. Morrison,* 1998 OK CIV APP 128, ¶ 9, 964 P.2d 966, 969. "Any conflict between the fundamental, constitutional right of parents to care for their children as they see fit and the statutorily created right of grandparental visitation must be reconciled in favor of the preservation of the parents' constitutional rights. The relationship between parent and child must be held paramount." *Herbst,* 1998 OK 100, ¶ 17, 971 P.2d at 399.

¶ 26 Grandparents' statutory right to "reasonable visitation" is conferred by title 43, section 109.4, upon a demonstration that: (1) it is "in the best interest of the child," (2) "parental unfitness" has been demonstrated or the "grandparent has rebutted, by clear and convincing evidence, the presumption that the fit parent is acting in the best interests of the child by showing that the child would suffer harm or potential harm without the granting of visitation rights to the grandparent of the child," and (3) the intact nuclear family has been disrupted by one of the events enumerated in the statute. One of those events is the death of a parent when the child has a preexisting relationship with the grandparent. Okla. Stat. tit. 43, § 109.4(A) (Supp.2009). These are the only circumstances in which "the [grandparent visitation] statute clearly divests parents of the right to decide what is in their child's best interest and gives that determination to the district court" vesting grandparents "with the standing to pursue visitation rights over the objections of the parents." *Herbst,* 1998 OK 100, ¶ 9, 971 P.2d at 397.

¶ 27 In this matter, the parents' fitness was evaluated and found to be insufficient. A temporary guardianship was imposed and the parents were directed to take certain steps in order to establish that they had regained fitness. Despite repeated opportunities to do so, the trial court refused or neglected to make findings as to whether Mother had complied with the court ordered directives and had thereby regained fitness.

¶ 28 The need for a finding concerning Mother's fitness became critical when the parties agreed to terminate the guardianship. The best interests of the child required that such a determination be made on the record prior to the award of joint custody to the parents. An unfit parent does not regain fitness by agreement of the parties or by implication. *See In re C.D.A.,* 2009 OK 47, 212 P.3d 1207, 1209. An on-the-record deter-

mination of fitness is required following an evidentiary hearing. The appellate record reveals no such inquiry. Nevertheless, the parents were awarded joint legal custody along with joint physical custody upon the expiration of a three-month transition from Paternal Grandparents' home. Mother was determined to be the sole legal custodian upon Father's death despite the fact that no determination was made as to her fitness. If Mother had been judicially determined to be fit at that time, she would have been entitled to all the rights of a parent including physical custody following a reasonable transition period. If the trial court had determined that Mother remained unfit, she would not have been entitled to legal or physical custody until such time as she demonstrated fitness.

¶ 29 The error in the trial court's failure to make the threshold determination of Mother's fitness was compounded in the trial court's order granting "visitation" to Paternal Grandparents. Although the trial court purported to grant grandparent visitation, it failed to establish a transition period in which Mother would regain physical custody. Instead, it awarded legal custody to Mother and physical custody to Paternal Grandparents until such time as the child's counselor, and expert witness for Paternal Grandparents, determined when the child had completed the grieving process so that a transition period could begin. In effect, the counselor was delegated the task of determining when, if ever, Mother could obtain physical custody of her child.

¶ 30 This Court acknowledges that the actions of the trial court may have been motivated by "the best interests of the child." However, the best interests of the child do not exist in a legal vacuum in which parental rights have no weight in determining physical custody. The child's interests must be determined in conjunction with Mother's fundamental constitutional right to the care and custody of her child. That right hinges upon a determination of her fitness. Absent unfitness, the best interests of the child are presumed to be with the parent. *M.R.S.*, 1998 OK 38, ¶ 21, 960 P.2d at 363. Legal custody without the accompanying physical custody is a hollow enforcement of the rights of a fit parent.

¶ 31 Absent Mother's continued unfitness, the trial court was duty bound to transition the child into Mother's physical custody and to permit her to make decisions regarding the child's welfare including his education. Instead, the trial court exceeded its statutory directive that grandparent visitation be "reasonable" by in effect awarding physical custody to Paternal Grandparents. Five days per week of "visitation" is a custody determination, not a determination of reasonable grandparent visitation. Thus, what began with the intention of protecting the best interests of the child has become a de facto guardianship with no end in sight. The trial court's assurances of the child's eventual reunification with Mother have lost credibility with the significant passage of time in which the sole legal custodian of the child has been deprived of custody and the ability to make decisions concerning his care and education. Concerns for the child's separation anxiety and the fact that he will continue to grieve the loss of Father cannot justify the continuing deprivation of Mother's fundamental right to the care and custody of her child if she has regained fitness.

¶ 32 The trial court's failure to determine Mother's fitness during this protracted litigation must be remedied expeditiously. At the present time, the child is not a ward of the court nor is he the subject of a guardianship. Yet, his custody has been placed indefinitely with Paternal Grandparents while Mother remains the sole legal custodian by virtue of Father's death. Paternal Grandparents have demonstrated that they wish to preserve the custody they have obtained through the trial court's expansive view of grandparent visitation and its willingness to delegate to the child's counselor the determination of when the child's reunification with Mother may begin, which leaves the reunification issue open. To date, there has been no determination by the trial court of the threshold question which controls whether the intrusion into Mother's parenting is warranted: Is Mother a fit parent? If she is, she is entitled to legal and physical custody of her son following a reasonable judicially established

transition period. The trial court must make an on-the-record determination concerning her fitness following an evidentiary hearing.

¶ 33 On this Court's own motion, the assigned trial judge in this matter is disqualified pursuant to section 95.10(A), title 20, of the Oklahoma Statutes. The facts stated in this opinion, as well as other facts provided by the record and appendices, demonstrate that the trial court has exceeded its authority and abused its discretion. The presiding judge of the twenty-first judicial district of the District Court of the State of Oklahoma is directed to assign this matter to another trial judge immediately. The newly assigned judge is directed to hold an expedited hearing and make determinations regarding the following issues: (1) Mother's present fitness; (2) if Mother is determined to be fit, a reasonable judicially established period for transition of the child into Mother's home; (3) Paternal Grandparents' right to reasonable visitation pursuant to section 109.4 of title 43; and (4) if the statutory criteria for grandparent visitation are demonstrated, a reasonable visitation schedule.

¶ 34 The trial court determinations required to resolve this matter are long overdue. For that reason, any request for rehearing from today's opinion must be filed no later than December 28, 2009. No request for extension of this deadline will be considered.

No. 106,814, REVERSED AND REMANDED WITH INSTRUCTIONS.

No. 107,579, ORIGINAL JURISDICTION PREVIOUSLY GRANTED; EXTRAORDINARY RELIEF GRANTED.

ALL JUSTICES CONCUR.