2011 OK 27

**In re the Marriage of Amanda D. CRAIG, now Evans, Respondent/Appellant,**

**v.**

**Tony D. CRAIG, and DeWayne and Glenda Craig, Petitioners/Appellees.**

No. 106,537.

Supreme Court of Oklahoma.

April 12, 2011.

Gary Briggs, Michael J. Miller, Legal Aid Services of Oklahoma, Inc., Oklahoma City, OK, for Appellant.

Ronald H. Lawson, Spiro, Oklahoma, for Appellees.

EDMONDSON, J.

¶1 The question presented in this case is whether paternal grandparents may obtain a court order compelling visitation with the grandchild without the District Court applying the grandparent-visitation statute. We answer that question in the negative. When grandparents seek a court order to compel visitation with their grandchild and against the consent of a sole custodial parent, a District Court must follow the grandparent-visitation statute.

¶2 Tony Craig (Father) left the marital home and his parents (Grandparents) gave assistance to Craig's wife, Amanda Craig, now Evans (Mother), and the child born to Amanda and Tony. Amanda and her child

(Grandchild) later changed their residence without notifying Grandparents. Grandparents paid a lawyer to bring a divorce proceeding on behalf of their son, and they sought to determine the location of Mother and Grandchild. Mother returned to Oklahoma and also filed for a divorce.

¶ 3 A final decree of divorce was entered, Mother was awarded custody of the minor child, and Father was granted visitation. However, the visitation was required to be supervised by his parents, the paternal grandparents. The decree provided that no unsupervised visitation or overnight visitation would occur until Father successfully completed a specified counseling program. One year after the divorce decree, Grandparents filed a motion in the divorce case for a court order that would give them the visitation that had been awarded to Father. The trial court held an evidentiary hearing on the motion.

¶ 4 Grandchild was eight years old at the time of the hearing. Grandmother testified that a few times Grandchild stayed overnight with Grandparents on Friday night, and on the following Saturday Grandparents would give Grandchild to a paternal aunt in Ft. Smith to stay at the aunt's home on Saturday night. Mother was upset that Grandparents allowed Grandchild to stay overnight with the paternal aunt without providing notice to Mother or getting permission from Mother. Mother did not want the child to be in Ft. Smith. The strained relationship between Grandmother and Mother broke when Mother refused two of Grandmother's requests: First, that Mother allow the child to attend a meeting at Grandmother's church; Second, that Mother bring the child and Mother's other children to a birthday tea party Grandmother had scheduled for another granddaughter. Grandmother testified that Mother declined to provide further visitation with Grandparents without the presence of the child's father.

¶ 5 Grandmother testified that she tried to get Father (her son) to enforce the visitation provision of the divorce decree, but he did not make any efforts other than making a telephone call to Mother requesting visitation. Grandmother testified that Father did not exercise his visitation rights either before or after the divorce decree. However, she also stated that Father would "occasionally" appear when the child was at Grandparents' home.

¶ 6 Mother wanted to know what activities her child would be involved in when staying with Grandparents. Grandmother testified that she did not know of any requirement that she get Mother's permission before taking the child to activities that Mother disapproved of or inform Mother what activities the child would be participating in, or that she was required to obtain Mother's permission before allowing the child to be in the custody and control of other paternal relatives. Grandmother testified that she once left the Grandchild alone with Father at Father's home for a few minutes while she ran an errand, but that this was a mistake in judgment that would not be repeated.

¶ 7 Grandmother testified that she had once lost her temper in front of Grandchild and called Mother an inappropriate name and made inappropriate comments. This incident occurred when Mother expressed her desire for Grandchild to be returned to her at 4:00 p.m. on a Saturday instead of on Sunday as had been previously allowed by Mother. Grandmother testified that she had wanted to take the child to a church meeting at her church. Mother wanted Grandchild go with her to Mother's church on Sunday, and she wanted her child returned Saturday afternoon. Grandmother testified that she did not understand Mother's conduct because Grandmother's church had a "singing group," and that Grandmother desired Grandchild to go with Grandparents to "the singing" at her church. Grandmother testified that she later telephoned Mother and apologized for her comments.

¶ 8 Mother testified that she is married. She has one child by her former marriage, Grandchild, and has two additional children with her current husband. She and her husband are employed, and her employment schedule allows her to transport the child to and from her school and normal daily activities. She testified that Grandparents, without giving notice or obtaining permission from her, enrolled Grandchild in certain ac-

tivities. Mother testified that she told Grandmother that she did not want Grandchild to engage in certain activities when Mother was not present. For example, Mother did not like Grandparents taking the child swimming without Mother's presence. She testified that Grandparents continued to take the child swimming after her request that they stop such conduct. She testified that she did not like Grandparents making, or attempting to make, decisions regarding her child "without even telling me what was going on, I wouldn't even know." She testified that she did not like the Grandchild–Grandparent relationship because "... how controlling they are and they don't let me know things ahead of time; they tell me after the fact."

¶ 9 Mother testified that visitation with Grandparents could continue in Mother's presence. She testified that she "offered that they can come and see her [Grandchild] at our house, for birthdays parties, we can meet at the park, anytime they wanted to, but they [Grandparents] want her to themselves without me there for some reason, so they just didn't want that; they didn't accept it." Mother testified of the incident concerning Grandchild returning to her on a Saturday and not attending Grandparents' church, and stated that it occurred on a weekend that was not a scheduled visitation time. She also testified that during the incident Grandparents placed Grandchild between them in their vehicle and initially would not let Grandchild out of the vehicle to return to Mother when she told her child to leave Grandparents' vehicle and leave with Mother. Mother testified that she did not want Grandchild regularly staying overnight with a paternal aunt because she did not like certain behavior of the paternal aunt's children.

¶ 10 The trial judge questioned Mother and asked her if she did not "believe that there is any room for forgiveness for a mistake if someone agreed that they wouldn't do that again?" In response to the judge's question, Mother explained that Grandparents "continue to do what they think is best instead of even consulting or asking me is this okay. They'll tell me one thing and do another, ...." She testified that Grandmother told her "that as long as ... [Grandchild] is in her [Grandmother's] 'custody' she didn't have to tell me anything." The trial court asked her if she didn't think that requiring Grandparents to come to her home for a visit "would be uncomfortable for them to come ... [because Mother had] a different husband ... and I mean, you're not inviting them [Grandparents] to spend the night." Mother testified that Grandparents and her husband "get along just fine" and there was no impediment to meeting Grandparents at her home, a park, or another location, as long as Mother was present.

¶ 11 Mother argued that Grandparents failed to meet their burden specified by the grandparent-visitation statute. Grandparents argued that the grandparent-visitation statute was not applicable. Grandparents relied on three appellate opinions. *Sicking v. Sicking*, 2000 OK CIV APP 32, 996 P.2d 471 (released for publication by order of the Court of Civil Appeals); *Hartness v. Hartness*, 1999 OK CIV APP 138, 994 P.2d 1196 (released for publication by order of the Court of Civil Appeals); and *In re Herbst*, 1998 OK 100, 971 P.2d 395.[1] Mother argued that Grandparents' interpretation of these opinions was contrary to this Court's opinions. We agree.

¶ 12 In *Sicking v. Sicking*, 2000 OK CIV APP 32, 996 P.2d 471, the appellate court stated that a father's court-ordered times for visitation were "his" time with the child, and that a custodial mother did not have a right to unilaterally veto a father's decision to have the child spend "his" time with paternal grandparents. Similarly, in *Hartness v. Hartness*, 1999 OK CIV APP 138, 994 P.2d 1196, paternal grandparents filed a motion for grandparent visitation and their son, the father, had "no objection to the grandparents exercising the father's visitation rights when he is unable to do so." *Id.* 994 P.2d at 1197.

---

1. Grandparents declined to file an appellate brief. This failure does not require reversal. *Hamid v. Sew Original*, 1982 OK 46, 645 P.2d 496, 497 ("Reversal is never automatic on appellee's failure to file answer brief."). Our analysis includes the arguments raised in the trial court by Appellees.

Although not cited by Grandparents, we note that in one opinion predating *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), this Court affirmed a trial court's order which granted a father visitation, and grandparents' visitation as the father would allow during father's time and, if father was unable to exercise visitation, granting grandparents visitation in father's absence. *K.R. v. B.M.H.*, 1999 OK 40, ¶ 12, 982 P.2d 521, 524. We noted that the grandparent-visitation statute required *reasonable* grandparent visitation and that no evidence was in the record showing *that father would deny* such visitation. *Id.* at ¶ 24, 982 P.2d at 525. Unlike both *Sicking* and *Hartness,* we addressed grandparents' claim in the context of measuring it against the grandparent-visitation statute.

¶ 13 Grandparents made a two-prong attack in asserting their right to court-ordered visitation. The first prong was the view that a non-custodial parent possesses a right, with court approval, to vest his or her court-ordered visitation in a non-parent third party. In summary, Grandparents submitted the view that court-ordered visitation rights possessed by a non-custodial parent are alienable by an exercise of the non-custodial parent's consent. In support of this argument at the hearing, counsel for Grandparents explained that "the father has actually filed an entry of appearance and he's consented to his parents exercising what he ordinarily would have," and "[Father] approved of his father [Grandfather] stepping into his shoes for the purposes of visitation." The argument was not merely that a non-custodial parent may waive visitation, but that the parent may vest that visitation right in a person of the non-custodial parent's choice. This argument was based upon the idea that no constitutional right of the custodial parent relating to custody and control of the child was at issue because the nature of the controversy was between two parents, the first being the custodial parent, and the second being a third-party who steps into the shoes of the non-custodial parent.

¶ 14 The second prong of Grandparents' attack was that the *only* issue necessary for the trial court to determine was whether it was in the best interests of the child for a parent-designated third-party to possess Father's previously awarded court-ordered visitation rights. They argued that this was the *only* issue for the trial court to determine because the times for visitation they sought were those already scheduled for visitation with Father.

¶ 15 A divorced parent has a "natural right" to visit his or her minor child. *In Re McMenamin,* 1957 OK 67, 310 P.2d 381, 383. This natural right is not taken away unless evidence shows that the parent has forfeited this right, or that the exercise of it would be detrimental to the child's welfare. *Harmon v. Harmon,* 1997 OK 91, ¶ 14, 943 P.2d 599, 604. The natural right possessed by a parent to the custody and control of the child, or visitation with the child in the absence of custody, springs from the parental *status, In Re Bomgardner,* 1985 OK 59, n. 23, 711 P.2d 92, 96, and is constitutionally protected because of that status and the parent-child relationship, *Lehr v. Robertson,* 463 U.S. 248, 257–263, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), and because of the privacy rights inherent in the Constitution, *In re Herbst,* 1998 OK 100, ¶ 12, 971 P.2d 395, 398.

¶ 16 This Court recently explained that "Grandparents have no constitutional right to custody of or visitation with their grandchildren. Such rights *are limited to those conferred by statute.*" *Murrell v. Cox,* 2009 OK 93, ¶ 25, 226 P.3d 692, 698 (quoting *Application of Grover,* 1984 OK 20, ¶ 12, 681 P.2d 81, 83) (emphasis added). In our case today, Grandparents do not rely upon Oklahoma's grandparent-visitation statute. 43 O.S.Supp. 2010 § 109.4. We have explained that "Visitation rights in the absence of a statute derive from the right to custody." *Barber v. Barber,* 2003 OK 52, ¶ 9, 77 P.3d 576, 580. Father has no present custodial rights, currently exercised *exclusively* by Mother, and his visitation rights are circumscribed based upon his previous behavior. Grandparents' claim to a right of visitation is not based upon their status as grandparents, but upon an assertion that Father wants them to have his visitation rights and that such is in the best interests of the child.

¶ 17 No authority is cited or argument provided by Grandparents that a non-custodial parent with circumscribed visitation rights may alienate and transfer those rights to a non-parent so that an Oklahoma court is *required* to recognize such transfer and enforce the transferred rights against a custodial parent. Grandparents seek to elevate their status by a court order that gives them the legal status of a non-custodial parent with visitation rights. The Grandparents did not seek a court order to assist their son in enforcing his visitation rights. Grandparents sought an order that *they*, and not Father, could judicially enforce *against Mother as the custodial parent.*

¶ 18 A legal "right" possessed by one person does not exist "in the air," but exists only with a corresponding legal "duty" possessed and required by another.[2] The forensic contest herein is one pitting a custodial and biological parent against paternal grandparents as non-parent third parties. Grandparents claim a judicially cognizable "right" to visitation and thereby seek to impose a "duty" upon the custodial parent in her relationship with Grandparents. A non-custodial father with visitation rights and a custodial parent may *agree* to grandparent visitation during the father's exercise of his visitation, and such may be judicially enforceable. *Ingram v. Knippers*, 2003 OK 58, ¶¶ 13–14, 72 P.3d 17, 21. An order memorializing such visitation possesses a quality of being judicially enforceable because it is based upon the underlying custodial parent's exercise of parental discretion and parental *consent. Id.*

¶ 19 When the power of the State is used to compel a custodial parent to alter his or her exercise of parental discretion in custody and visitation matters, the State must have a sufficiently compelling interest to justify such compulsion. For example, in *Murrell v. Cox, supra*, we explained that "Judicial determinations of custody and visitation constitute state action and the State's interest in making such determinations must be sufficiently compelling to warrant invasion."

2009 OK 93, ¶ 24, 226 P.3d at 698. Courts have recognized that "Mandating the introduction of a third party, even a grandparent, into a family unit is state action limiting the parents' liberty." *Herbst*, 1998 OK 100, ¶ 14, 971 P.2d at 398–399.

¶ 20 The legal duty Grandparents seek to impose on Mother is not based upon her consent, but upon an exercise of the power of the State in altering a parent's constitutional right to the custody and control of the parent's child. When the State imposes a duty upon a custodial parent to compel the parent's conduct in matters pertaining to custody and control of that parent's child, that parent is entitled to certain protections guaranteed by our federal and state constitutions.

¶ 21 In *Neal v. Lee*, 2000 OK 90, 14 P.3d 547, we commented on *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and explained that the U.S. Supreme Court invalidated a visitation statute finding that it impermissibly interfered with "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." 2000 OK 90 at ¶ 6, 14 P.3d 547, quoting *Troxel*, 530 U.S. at 66, 120 S.Ct. 2054. We explained that the plurality opinion and two concurring opinions of the High Court were based upon several factors: (1) the grandparents did not allege and the lower court did not find that the mother was unfit, (2) the lower court gave no special weight to the parent's determination of the child's best interests, (3) the lower court placed the burden on the mother to show that grandparent visitation would not be in the child's best interests, (4) the lower court did not invoke the traditional presumption that a fit parent will act in the best interest of his or her child and (5) the parent did allow some visitation with the grandparents. *Neal*, at ¶ 7. Justice Souter's opinion concurring in the Court's judgment agreed with the plurality, explaining that the Washington statute would be unconstitutional if applied so as to give grandparents those "visitation

---

**2.** *See, e.g., Silver v. Slusher*, 1988 OK 53, n. 28, 770 P.2d 878, 884, quoting W. Hohfeld, *Fundamental Legal Conceptions* (1923) at 78, and Leake, *Law of Property in Land* (1st ed., 1874) at 1–2, and explaining that rights against persons imports a correlative positive legal duty, and the performance of that duty "is secured by the legal remedies provided for a breach of that duty."

rights subject only to a free-ranging best-interests-of-the-child standard." *Troxel*, 530 U.S. at 76–77, 120 S.Ct. 2054. This is so, in part, because when the granting of the visitation is "subject only to the State's particular best-interests standard, the state statute sweeps too broadly and is unconstitutional on its face." *Id.*

¶ 22 In our case today, Grandparents essentially argued that they must show only that visitation is in the best interests of the child, and that this determination of best interests is not based upon any of those factors specified in the grandparent-visitation statute. In *Murrell v. Cox, supra,* we noted the application of that statute and some of the factors considered when grandparent visitation is ordered.

> Grandparents' statutory right to "reasonable visitation" is conferred by title 43, section 109.4, upon a demonstration that: (1) it is "in the best interest of the child," (2) "parental unfitness" has been demonstrated or the "grandparent has rebutted, by clear and convincing evidence, the presumption that the fit parent is acting in the best interests of the child by showing that the child would suffer harm or potential harm without the granting of visitation rights to the grandparent of the child," and (3) the intact nuclear family has been disrupted by one of the events enumerated in the statute. One of those events is the death of a parent when the child has a preexisting relationship with the grandparent. Okla. Stat. tit. 43, § 109.4(A) (Supp. 2009). These are the only circumstances in which "the [grandparent visitation] statute clearly divests parents of the right to decide what is in their child's best interest and gives that determination to the district court" vesting grandparents "with the standing to pursue visitation rights over the objections of the parents." *Herbst,* 1998 OK 100, ¶ 9, 971 P.2d at 397.

*Murrell v. Cox,* 2009 OK 93, ¶ 26, 226 P.3d at 698.

Grandparents did not want to be required to show that Mother was unfit. They testified that she was a fit parent, and argued that her fitness was not an issue in their quest for court-ordered visitation. The trial court specifically concluded that the issues in *Troxel* were not applicable because Grandparents were using the Father's "time" for visitation, and that it could determine the visitation issue based upon a best-interests standard without applying any of the factors in the grandparent-visitation statute that would control that standard or limit the trial court's discretion. The trial court's application of a best-interests standard so as to give visitation without application of the visitation statute is an example of a court giving grandparents those "visitation rights subject only to a free-ranging best-interests-of-the-child standard," a practice condemned in *Troxel.*

¶ 23 In *Neal v. Lee,* 2000 OK 90, 14 P.3d 547, the grandparent did not allege that harm would occur to the child without the visitation. We stated the following:

> ¶ 9 In *In re Herbst,* 1998 OK 100, ¶ 18, 971 P.2d 395, 399, this Court found that, under the Oklahoma Constitution, "[i]f operating over the objection of fit parents, grandparental visitation may be imposed only upon a showing that the child would suffer harm [or potential harm] without it." *Id.* 1998 OK 100 at ¶ 16, 971 P.2d at 399. After *Troxel,* it is unclear whether a showing of harm is necessary under the United States Constitution. However, this Court's application of the Oklahoma Constitution in *Herbst* is unchanged by *Troxel.* Under *Herbst,* "[t]o reach the issue of a child's best interests, there must be a requisite showing of harm, or threat of harm . . . ." *Id.* 1998 OK 100 at ¶ 18, 971 P.2d at 399. Karen Sue Neal [Grandparent] bore the burden of showing harm to the children.

*Neal,* 2000 OK 90, at ¶ 9, 14 P.3d at 550.

¶ 24 Grandparents' motion for visitation made no allegation of harm or potential harm to the child in the absence of court-ordered visitation. Their allegation was that "It is in the best interests of the minor child that the child maintain a strong and healthy relationship with her paternal family and the court should grant to DeWayne Craig and Glenda Craig reasonable rights of visitation with the minor child." Their testimony was that they desired to continue the good relationship they had with their grandchild. Their post-trial brief pointed to no testimony relating to harm or potential harm to the child in the absence of the court-ordered visitation they

sought. Mother's testimony that Grandparents could continue visitation, although in the Mother's presence, was not denied by Grandparents. The trial court's order made no findings relating to harm or potential harm to the child.

¶ 25 In *Herbst*, we explained that "a vague generalization about the positive influence many grandparents have upon their grandchildren falls far short of the necessary showing of harm which would warrant the state's interference with this parental decision regarding who may see a child." *Herbst*, at ¶ 16, 971 P.2d at 399. When the power of the State is used to compel a parent to give up custody and control of the parent's child there must be a showing of harm or potential harm to the child to justify such compulsion. We explained this principle in 1998 in *Herbst* at ¶ 16, again in 2000 in *Neal* at ¶ 12, and again in 2009 in *Murrell* at ¶ 26. In *Neal*, we explained that this results from application of the *Oklahoma Constitution*. Consistent with our opinions from 1998, 2000, and 2009, we again hold that a non-custodial non-parent third-party may not use the power of the State to compel a custodial parent to relinquish custody and control over that parent's child and submit to court-ordered visitation without satisfying the non-parent's burden of showing harm or potential harm in the absence of such visitation.

¶ 26 In 1980, we stated that "A parent is under no legal obligation to permit a child to visit its grandparents *in the absence of a statute*." *Leake v. Grissom*, 1980 OK 114, ¶ 8, 614 P.2d 1107, 1110 (emphasis added). In 1984, we stated that grandparent rights to custody or visitation "are limited *to those conferred by statute*." *Application of Grover*, 1984 OK 20, 681 P.2d 81, 83 (emphasis added). In 1985, we stated that "Extant case law has confined grandparent claims of access *to those conferred by statute*." *In Re Bomgardner*, 1985 OK 59, ¶ 3, 711 P.2d 92, 94 (emphasis added). In *Bomgardner*, we did not allow a claim for grandparent visitation to be pressed outside the bounds of the grandparent-visitation statute, and we required the grandparents' request to be governed by the grandparent-visitation statute. *Id.* at ¶ 1, 711 P.2d at 93–94.

¶ 27 In 2004, we were presented with a case where grandparents sought court-ordered visitation but there was no action brought pursuant to the grandparent-visitation statute. We observed that "The subject matter jurisdiction of the court had been not invoked by proper pleadings to hear and determine a cause under § 5 [the grandparent-visitation statute], and the trial court had no jurisdiction under that statute of either the subject matter or the parties to hear the cause purported to be subject to those provisions." *In re A.N.O.*, 2004 OK 33, ¶ 12, 91 P.3d 646, 650 (explanatory phrase added). We concluded that "These efforts by grandparents to obtain visitation should have been dismissed by the trial court for lack of subject matter jurisdiction." *Id.* In 2003, we relied upon the above-quoted language from *Leake* when explaining that "in the absence of a statute that dictates visitation" a former husband's parents could not obtain court-ordered visitation of children who had not been adopted by the former husband. *Barber v. Barber*, 2003 OK 52, ¶ 9, 77 P.3d 576, 580. In 2009, we relied upon *Application of Grover, supra*, to explain that a grandparent's rights to court-imposed visitation "are limited to those *conferred by statute*." *Murrell v. Cox*, 2009 OK 93, ¶ 25, 226 P.3d 692, 698 (emphasis added).

¶ 28 Consistent with our opinions from 1980 through 2009, we again hold that a grandparent's rights to court-compelled visitation with a grandchild are statutory. We expressly overrule *Sicking v. Sicking*, 2000 OK CIV APP 32, 996 P.2d 471 and *Hartness v. Hartness*, 1999 OK CIV APP 138, 994 P.2d 1196, to the extent that they allow a grandparent to obtain court-ordered visitation without either the consent of the custodial parent or application of the grandparent-visitation statute.

¶ 29 The opinion of the Court of Civil Appeals is vacated and the order of the District Court is reversed.

¶ 30 TAYLOR, C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, REIF, COMBS, GURICH, JJ., concur.

¶ 31 COLBERT, V.C.J., concurs in result.