2010 OK CIV APP 54

In re C.L.D., an allegedly deprived child under the age of 18 years.

State of Oklahoma, Petitioner/Appellee,

v.

Bennie Lee Duke, Jr., Respondent/Appellant.

No. 106,320.

Court of Civil Appeals of Oklahoma, Division No. 2.

May 5, 2010.

John M. Wampler, District Attorney, Stephen Booker, Assistant District Attorney, Altus, OK, for Petitioner/Appellee.

Daniel E. McMahan, Altus, OK, for Respondent/Appellant.

Rana Wycoff Womack, Altus, OK, for Minor Child.

JOHN F. FISCHER, Presiding Judge.

¶ 1 In this deprived child proceeding, natural father, Bennie L. Duke, Jr., appeals from an order of the district court granting a petition for kinship guardianship and appointing maternal grandmother and her husband as permanent guardians for his minor son CLD. Based on our review of the record on appeal and applicable law, we affirm the order.

## BACKGROUND

¶ 2 In October 2004, 4–year–old CLD was taken into emergency custody by the Depart-

ment of Human Services (DHS) on allegations against his natural parents Bennie Duke, Jr. (Father), and Stephanie Epperson (Mother) of sexual abuse, neglect and failure to protect. CLD was hospitalized on that date with an abrasion in the gluteal fold and anal leakage. The child was constipated, had severe diaper rash and dried feces on his buttocks. The child was also in need of dental care; one of the caps on his severely decayed upper teeth had fallen out and had not been replaced. DHS had additional concerns for the child because Father's brother, Benjamin Duke (Uncle), had previous convictions for multiple counts of sodomy and lewd molestation involving minor children.[1] While CLD remained in emergency custody, he disclosed to the foster mother that Father and Uncle had "put their fingers up [my] butt."

¶ 3 On November 1, 2004, the State of Oklahoma filed a petition requesting that the district court adjudicate CLD deprived because the child did not have the proper parental care or guardianship and/or the home was an unfit place for him by reason of neglect, abuse, cruelty, or depravity on the part of his parents. The State alleged:

(1) on 10/18/04, [CLD] presented at Jackson County Memorial Hospital with an abrasion in the gluteal fold and anal leakage. [CLD] later stated that his father, Bennie Duke, and his uncle, Benjamin Duke, had stuck their fingers in his anus.
(2) The mother, Stephanie Epperson, knew

or should have known of the alleged abuse and failed to protect. (3) Both parents, Bennie Duke and Stephanie Epperson, have failed to provide adequate physical care for the child, to-wit: (a) on 10/18/04, there was a rash on his diaper area and dried feces on his buttocks, and (b) on 10/18/04, the parents had not yet sought attention for CLD's teeth, one of which had previously lost a cap.

¶ 4 After several continuances, CLD's adjudication hearing took place on April 8, 2005. Mother stipulated to the State's petition. Father stipulated to the allegations in the petition involving CLD's medical/dental condition, improper nutrition and the failure to prevent the child from being "near a person [Uncle] who had served ... seven-to-ten years for multiple counts of child molestation." The district court adjudicated CLD deprived and ordered a hearing regarding entry of an Individualized Service Plan (ISP) for the parents.

¶ 5 On September 23, 2005, the district court entered a dispositional order that required Father to successfully complete a DHS treatment plan. This was an amended order that changed the requirements of the first DHS-proposed ISP.[2]

¶ 6 CLD continued to remain in DHS custody and, on November 24, 2005, pursuant to an Interstate Children's Placement Compact, and after completion of a home study, DHS

---

**1.** Mother and Father had divorced in May 2004, after Mother began a relationship with Uncle and moved into Uncle's home, taking CLD with her. There was some testimony that Mother claimed to be wearing an engagement ring given to her by Uncle. Father was aware of Uncle's lewd molestation convictions and claimed that he asked Mother to move back in with him so that CLD would not be around Uncle. He convinced Mother to move back in with him, and within approximately one month, DHS had taken custody of CLD.

**2.** At a hearing on April 20, 2005, Father objected to part of the first proposed ISP, arguing that it was based on hearsay, speculation and rank gossip regarding another of his children. This involved Father's 14-year-old daughter from a previous relationship, and a statement in the plan that "there is information available that [he] had sexually penetrated her." Father had agreed to termination of his parental rights to her and

testified that he had not seen her since she was 4-years-old. Father also argued that all matters that did not directly relate to the stipulated items of failure to protect, provide proper medical care and nutrition should be omitted from the ISP. Father specifically objected to the requirement that he undergo a "psychosexual evaluation," on grounds that any sexual abuse allegations against him regarding CLD remained unsubstantiated and because there was nothing in the record to indicate the reliability of such testing when performed on a "mentally retarded person." A psychological evaluation performed on Father revealed that Father's full scale IQ of 66 placed him in the "mildly mentally retarded range of intellectual functioning." The district court entered a dispositional order changing the requirements of the first proposed ISP after Father filed an emergency writ in the Supreme Court. The writ was dismissed after the district court withdrew the first ISP.

placed the child with maternal grandmother, Karlyn Miller, and her husband, Terry Miller (Grandparents), in Quinlan, Texas.

¶ 7 CLD had been in DHS custody for a period of 23 months when his attorney filed a Petition for Kinship Guardianship, in which Karlyn Miller joined. An amended petition was filed, in which Terry Miller joined, seeking determination that a kinship guardianship should be entered naming Grandparents guardians for CLD pursuant to 10 O.S. Supp. 2006 § 7003–5.5(C)(8). The State approved the kinship guardianship, but advised the district court that the State would pursue termination of parental rights if a kinship guardianship order was not entered.

¶ 8 The district court conducted a non-jury trial.[3] At the time of trial, CLD had been residing with Grandparents for approximately 18 months. On the first day of trial, June 12, 2007, Mother filed her consent to the transfer of permanent care and custody of CLD to Grandparents.[4] After the second day of trial, the district court granted the petition for kinship guardianship, appointing Grandparents as general guardians for the child and granting Father limited visitation. Father appeals.

## STANDARD OF REVIEW

■■■ ¶ 9 The petition for kinship guardianship, filed pursuant to 10 O.S. Supp.2006 § 7003–5.5(C)(8), requires that the district court's determination be supported by the "clear and convincing" level of proof. *In re Guardianship of S.M.,* 2007 OK CIV APP 110, ¶ 13, 172 P.3d 244, 247. Our review on appeal must also demonstrate the presence of clear and convincing evidence to support the trial court's decision. *See In re S.B.C.,* 2002 OK 83, ¶ 7, 64 P.3d 1080, 1083 (holding that appellate review in a parental-bond-severance proceeding must be nothing less than

the very same standard as that which is required in the trial courts).

## ANALYSIS

### I. The Required Statutory Findings

¶ 10 At the periodic review hearings following the adjudication of CLD as deprived, DHS consistently recommended termination of Father's parental rights. However, when Grandparents indicated their willingness to become permanent guardians of CLD, the State agreed to and supported Grandparents' petition, but reiterated that if the kinship guardianship did not proceed, the State would pursue termination of Father's parental rights.

■■ ¶ 11 Section 7003–5.5 sets forth the dispositional orders that the district court may enter following adjudication of a child as deprived.[5] The procedure to be followed when a kinship relation is at issue is provided by statute:

> When reunification of the family is not recommended or possible, as determined by the court, the court may order a child's permanent care and custody transferred to a kinship guardian subject to residual parental rights and responsibilities and subject to such orders of the court as deemed necessary for the health, safety or welfare of the child.

10 O.S. Supp.2006 § 7003–5.5(C)(8)(a).

A petition for kinship guardianship shall allege, and the petitioner must prove by clear and convincing evidence, the following six elements:

> (1) the child is in the legal custody of the Department,
>
> (2) more than twelve (12) months have passed since the date of the dispositional order placing such child in the legal custody of the Department,

---

**3.** The trial was conducted by the successor judge, who had been appointed by the Presiding Judge of the District Court on May 15, 2007, to replace the Honorable Clark Huey after Father requested Judge Huey's recusal. The trial proceeded over two days. The second day of trial took place on August 15, 2007.

**4.** Mother had failed to comply with most of the aspects of her ISP. The record contains evidence regarding her severe mental instability and continued association with Uncle.

**5.** Amended and renumbered as 10A O.S. § 1–4–706 by Laws 2009, HB 2028, ch. 233, § 248, emerg. eff. May 21, 2009.

(3) the parents of the child are presently and for the foreseeable future unable to provide proper and adequate care for the child,

(4) the prospective kinship guardian consents to the appointment,

(5) the child has resided with the kinship foster parent and there exists a loving and emotional tie between the child and the kinship foster parent, and

(6) it would be in the best interests of the child for the petition to be granted.

Section 7003–5.5(C)(8)(c). "If, in a non-consensual proceeding, the trial court finds these elements have been proved with clear and convincing evidence, then the trial court is directed to grant the petition." *In re S.M.*, 2007 OK CIV APP 110 at ¶ 13, 172 P.3d at 247 (citing section 7003–5.5(C)(8)(f)).

¶ 12 Father claims that the district court abused its discretion in denying him the right to regain custody of CLD after completion of the requirements of his ISP. The record shows that Father did not complete individual counseling or participate in anger management classes. He did not keep monthly contact with the DHS caseworker or provide monthly rent and utility receipts to her. He was not consistent in visiting CLD. There was clear and convincing evidence, and the district court found, that Father had not completed all of the requirements of the ISP. Even if Father had completed all aspects of the ISP, that fact would not be determinative of Father's ability to provide proper and adequate care for CLD "for the foreseeable future." Section 7003–5.5(C)(8)(c). Just as failure to perform an ISP is not conclusive proof of the need to terminate parental rights, completion of an ISP does not automatically prove that the conditions that led to the deprived determination no longer exist. *See In re S.A.*, 2007 OK CIV APP 97, ¶ 12, 169 P.3d 730, 735. Neither the law nor the facts supports Father's argument regarding completion of his ISP.

¶ 13 Father also maintains that there is no evidence that he had not properly cared for CLD in the past. The record conclusively shows otherwise. The issues before the district court involved not only Father's past conduct, but also whether, in the future, he would be able to provide that level of care and protection needed by the child. Indeed, as indicated by comments from the bench, that was one of the primary concerns of the district court. *See In re Baby Girl L.*, 2002 OK 9, ¶ 23, 51 P.3d 544, 554–55 (noting that protection of children from harm is the foundation of Oklahoma parental-rights-termination law).

¶ 14 First, DHS child welfare specialist testified that, in her opinion, CLD would likely face emotional harm if removed from the long-term foster placement with Grandparents and returned to live with Father. Second, DHS was aware that Father had allowed Mother to reside with him when she had not completed the provisions of her ISP. Third, Mother and Father both maintained contact with convicted sex offender, Uncle. Fourth, DHS was justifiably concerned about CLD's future exposure to the risk of sexual abuse and Father's ability to provide a stable home free from the threat of sexual abuse. Father's evidentiary-based argument clearly fails.

## II. Placement With Grandparents

¶ 15 In his second proposition of error, Father asserts that the district court's permanent placement of CLD with Grandparents was an abuse of discretion. This argument is based solely on his contention that Grandmother failed to properly raise her own children.

¶ 16 CLD was initially placed with Grandparents in November 2005, after completion of a home study in cooperation with the State of Texas that included a background check and also provided details regarding Grandparents' financial situation, medical health, and fitness to care for CLD. Before DHS actually placed CLD with Grandparents, DHS informed Father of its intended foster care placement. Father agreed with the placement. By the time of trial, CLD had spent months thriving in Grandparents' home, and the State, DHS, and the child's attorney agreed that the kinship guardianship was appropriate. We find no merit to this proposition of error.

## III. Father's Constitutional Claims

¶ 17 We acknowledge that "the relationship of parents to their children [is] a fundamental constitutionally protected right." *Murrell v. Cox,* 2009 OK 93, ¶ 24, 226 P.3d 692, 695 (citing *In re Chad S.,* 1978 OK 94, ¶ 12, 580 P.2d 983, 985). The Oklahoma Supreme Court has consistently held that "the right of a parent to the care, custody, companionship and management of his or her child is a fundamental right protected by the federal and state constitutions." *Id.* (citing *In re Grover,* 1984 OK 20, ¶ 9, 681 P.2d 81, 83). The parent's constitutional interests, however, are not the only constitutional rights at stake.

> The interest of children in a wholesome environment has a constitutional dimension no less compelling than that the parents have in the preservation of family integrity. In the hierarchy of constitutionally protected values both interests rank as fundamental and must hence be shielded with equal vigor and solicitude.

*In re T.H.L.,* 1981 OK 103, ¶ 13, 636 P.2d 330, 334 (footnote omitted).

¶ 18 Although a permanent plan of legal guardianship certainly limits Father's care, control of and decision-making regarding CLD, the kinship guardianship ordered by the district court is not the equivalent of, and is less intrusive than, termination of Father's parental rights. With the kinship guardianship in place, he retains residual parental rights and responsibilities and limited visitation. Further, although it is essentially a permanent placement for CLD, the continued fitness of Grandparents to serve as guardians is addressed in section 7003–5.5(C)(8)(h), which sets forth grounds for termination of the kinship guardianship.

¶ 19 Finally, Father argues that the district court was required to find, by clear and convincing evidence, that he was "unfit." Father insists that the record does not establish his "unfitness." However, such proof was not required before the district court could grant the petition for kinship guardianship. The authority cited by Father in support of this argument is not applicable under the circumstances of this case where a prior deprivation of custody occurred pursuant to a deprived child adjudication. *See In re S.M.,* 2007 OK CIV APP 110 at ¶¶ 14–15, 172 P.3d at 247. Father's constitutional rights are protected by the statutory burden, imposed by section 7003–5.5(C)(8)(f), to prove by clear and convincing evidence the statutory elements of a section 7003–5.5(C)(8)(c) kinship guardianship.

## IV. The Child's Best Interests

¶ 20 The evidence was that CLD thrived after he began living with Grandparents. At some point, CLD had been diagnosed with Attention Deficit Hyperactivity Disorder and Post Traumatic Stress Disorder. The DHS caseworker testified at trial that CLD showed remarkable improvement, both behaviorally and intellectually, since living with Grandparents. There were reports that, after visits with Mother and Father, CLD acted up at school, became aggressive with other children and started stuttering. When CLD first went to live with Grandparents, his developmental performance was in the low average level. However, while continuing to live with Grandparents, CLD's evaluation levels had improved to the point where he performed academically at grade level and no longer qualified for speech therapy and other special services at school.

¶ 21 Father demonstrated significant compliance, but not complete compliance, with the terms of the ISP. Father also testified that he was willing to care for CLD, support him, monitor his intellectual development and follow all recommendations of professionals providing services to him and CLD. Father's earnestness, however, does not necessarily equate to the ability to provide proper and adequate care for CLD.

¶ 22 Father received social security disability benefits of $560 per month due to medical and mental conditions. His total income was approximately $1,215 per month, including the salary he earned from working at a horse ranch. Father worked long hours, from 8:00 a.m., until 6:00 p.m., sometimes 6–7 days a week, while getting colts ready for sale. His job also required that, on occasion, he travel out of town, requiring overnight stays of up to 3 nights.

¶ 23 The evidence shows that Father had never had the sole responsibility for CLD, and, as a result, he lacked experience in caring for him. Father, when asked how he would provide care for CLD during overnight trips, indicated that he had no "back-up" plan, and had no suitable family members to whom he could turn for help with CLD. Father believed that, when he had to travel out of town for his employer, he could find a day care center where he could leave CLD. Father had no license to drive, and was unable to drive because of vision problems that resulted from his diabetes. When asked how he would provide transportation for CLD, Father stated that he intended to do so by taxicab or by charter transit minibus. Where, as here, a parent has not had physical custody of a young child for a protracted period of time, testimony as to the effect of returning the child to the custody of the parent is probative of the child's best interests.

¶ 24 In addition, Father had not provided support for CLD during the period the child was with Grandparents. Father testified that the reason he did not pay support was because there was no court order requiring him to do so.

¶ 25 Further, Father was still seeing Mother, who had failed to complete a substantial portion of her ISP and who had been diagnosed with severe psychological disorders. During the week before trial, a DHS social worker visited Father's apartment and found Mother residing there. When questioned during the first day of trial regarding the circumstances of Mother's presence in his home, Father testified that Mother had stayed with him for 3 or 4 days because he had emergency knee surgery, the doctor required someone to stay with him, and Mother was willing to help. Two months later, during the second trial day, Mother testified that she had stayed with Father for a period of 4 weeks following the knee surgery. She also testified that Uncle was at the home every day during Father's recuperation period. Mother claimed that Father still called her every day, and she saw him 3–4 times per week. As for this conflicting testimony, "the trial court heard the parties testify and observed their demeanor on the witness stand and is in better position to evaluate their testimony than is this court from an examination of the record of the testimony on these items." *In re Guardianship of C.D.A.*, 2009 OK 47, ¶ 10, 212 P.3d 1207, 1210 (quoting *Gibson v. Dorris*, 1963 OK 235, ¶ 3, 386 P.2d 186, 187).

¶ 26 Father maintained that he would not ever allow CDL to be around Uncle. Father admitted, however, that he still maintained a relationship with Uncle, although he described the relationship as "[not] too strong." Father testified that he only "occasionally" talked to Uncle, but when cross-examined he indicated that he probably talked to Uncle weekly. Father also testified: "Me and my mom, we talk a lot. . . . I mean, it ain't like I'm going over there every day or anything. I mean, I call mom if [Uncle's] over there and see if she's seen him and I call his house but as far as going to his house, no."

¶ 27 When Father was 19–years–old, he pled guilty and was convicted of lewd or indecent proposal or acts to a male child between the ages of 6–8 years.[6] Father relinquished his parental rights to his older daughter from a previous relationship. The girl was removed from Father's home in the wake of allegations that she had been abused by Uncle and one of Uncle's friends.

¶ 28 Father blamed Uncle for the fact that both his children had been removed from him. He also blamed their mothers. And yet, even though Father blamed Mother and Uncle for DHS's involvement with CLD, he turned to them when he needed help. He let Mother move into his home, and there was evidence that, when she was not living with Father, he still kept in constant contact with her. He recommended Mother, and she was hired to care for, a small child living in an apartment two doors down from Father. Perhaps one of the most troubling aspects of Father's testimony concerned his knowledge

---

6. The parties stipulated that, although Father was 19–years old at the time of the conviction, he had a mental age of 14½ years.

that Mother had resumed her relationship and was "back with" Uncle.

## CONCLUSION

¶ 29 The record contains clear and convincing evidence supporting the order for a kinship guardianship. We find no error of law or abuse of discretion affecting the validity of the district court's order. The evidence herein establishes that CLD's best interests would be served by the kinship guardianship ordered by the district court. Accordingly, we affirm the district court's order appointing Grandparents as permanent guardians for CLD.

¶ 30 **AFFIRMED.**

WISEMAN, C.J., and BARNES, J., concur.