**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ZANE HEDGER; LEAH HEDGER,
individually, and as parents and next of kin
of J.R.H., deceased; S.H., a minor,

     Plaintiffs - Appellants,

v.

TRACI D. KRAMER, an individual;
JULIE WHITAKER, in her individual
capacity; TAMARA WASHINGTON, in
her individual capacity; THE
OKLAHOMA DEPARTMENT OF
HUMAN SERVICES, an Oklahoma
political subdivision,

     Defendants - Appellees,

and

MISTY LEITCH, in her individual
capacity; THE CITY OF EDMOND,
Oklahoma, a municipal corporation;
KEVIN KRAMER, an individual,

     Defendants.

No. 16-6274
(D.C. No. 5:13-CV-00654-HE)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **HOLMES**, Circuit Judges.
_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

This litigation arises out of the tragic death of nine-month-old J.R.H. from head trauma in March 2011 and the temporary removal of his five-year-old brother S.H. from the custody of their parents, Zane and Leah Hedger (Plaintiffs). Before being taken to the hospital, J.R.H. had been at the home of his babysitter, Traci Kramer. Social worker Julie Whitaker and her supervisor Tamara Washington, both employed by the Oklahoma Department of Human Services (DHS), were involved in the removal of S.H. from Plaintiffs' custody after J.R.H.'s injury. Plaintiffs, both individually and as parents and next of kin of J.R.H. and S.H., sued Kramer for the death of their younger son and sued several others, including Whitaker, Washington, and DHS, for depriving them of the custody of their older son. The federal district court dismissed all of Plaintiffs' claims, except for a negligence claim against Kramer, which has been stayed because of Kramer's bankruptcy.

Plaintiffs appeal the district court's rulings (1) rejecting their contention that their claim against Kramer alleged a willful and malicious tort and denying their motion to amend the claim to make that allegation explicit; (2) granting summary judgment to Whitaker and Washington; and (3) dismissing the claim against DHS. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The district court correctly determined that Plaintiffs' complaint did not allege a willful and malicious tort against Kramer, and it did not abuse its discretion in denying an untimely motion for leave to amend. We affirm the dismissal of the substantive-due-process claim against Washington and Whitaker under the doctrine of qualified immunity. And we affirm on the merits the judgment

2

against Plaintiffs on their malicious-prosecution claim against Washington and Whitaker and their unlawful-seizure claim against Washington, Whitaker, and DHS.

## I. BACKGROUND

### A. Factual Background

At about 8 A.M. on March 8, 2011, Plaintiffs left J.R.H. at the home of Kramer, J.R.H.'s babysitter. When Kramer went to wake J.R.H. from a nap at 3 P.M., she found the baby unconscious and not breathing, so she called 911. Detective Misty Leitch of the City of Edmond Police Department was assigned to investigate. Leitch "reported suspected physical abuse" to a hotline maintained by DHS, which assigned Whitaker to investigate.

J.R.H. was first taken to Baptist Hospital, where Whitaker and Leitch conducted several interviews. An ER physician stated that J.R.H. had a skull fracture but could not tell whether it was old or new; Plaintiffs and Kramer each said that they did not know how the fracture happened. Leah Hedger stated that two weeks earlier, J.R.H. "had a notable bruise" on his head, and that four to six weeks before that he "had been treated for a fractured arm/shoulder." *See* Aplt. App., Vol. 1 at 408 & n.4. Plaintiffs and Kramer again could not explain how the injuries occurred.

That evening, J.R.H. was transferred to the University of Oklahoma's Children's Hospital. Whitaker and Leitch spoke with Dr. Christine Allen, J.R.H.'s treating physician there. At her deposition five years later, Whitaker testified that Dr. Allen "communicated that she didn't think the parents would have done this to the baby," but she did not recall whether the doctor had stated the basis of this belief. *Id.* at 665. Later

3

in the deposition, when asked if it was during this interview with Dr. Allen that "Dr. Allen told you she believed the babysitter was the cause of [J.R.H.'s] injuries," Whitaker responded, "I believe so." *Id.* at 668. Whitaker could not recall why her report (issued a week after the incident) had not mentioned Dr. Allen's belief.

Leitch and Whitaker decided that S.H. should be in protective custody pending further investigation. Plaintiffs were so informed and were told that authorities would hold an emergency hearing about S.H. the next day. Edmond law-enforcement officers picked up S.H. and he spent the night in a shelter.

The following day, March 9, an Oklahoma County Assistant District Attorney (ADA) filed an application to put S.H. into emergency custody, submitting an affidavit from Whitaker with the application. The 13-sentence affidavit noted J.R.H.'s skull fracture and prior injuries. It did not contain a reference to Dr. Allen's statement that she did not think Plaintiffs caused J.R.H.'s skull fracture. It also did not reference a statement by Amy Baum (a Children's Hospital social worker) in which Baum told Whitaker that both she and Dr. John Stuemky (a physician at the hospital) thought that Plaintiffs had not caused the fracture. In its order granting summary judgment, the district court noted that the Baum conversation was at about 2:30 P.M. on the day the affidavit was submitted, so it was "questionable" whether Baum's statement preceded Whitaker's submission of the affidavit. Aplt. App., Vol. 1 at 411.

Based on the ADA's application, an emergency custody order was entered on March 9, directing that both J.R.H. and S.H. be taken into custody. After a hearing that day, S.H. was placed in foster care with his aunt.

4

J.R.H. died on March 9. A show-cause hearing was held the next day before a referee in the state court's Juvenile Division. Whitaker testified, recommending that S.H. go into DHS custody. When asked about Dr. Allen, she said that the doctor "did not say . . . definitively" that the injury happened between 8:00 a.m and 3:00 p.m., which was when J.R.H. was with Kramer. Aplt. App., Vol. 2 at 563. Whitaker testified that it was unknown who caused the skull fracture, but that evidence indicated that the injury was likely not accidental. When asked if Dr. Allen "indicate[d] to [Whitaker] in any way that she had a concern with the parents," Whitaker stated that Dr. Allen intended to file a CHO-25, a form used to report suspected child abuse and neglect. *Id.* at 563. Whitaker also testified that she had not spoken to Dr. Stuemky, but that she had spoken with the hospital social worker, a possible reference to Baum. The referee held that DHS's pick-up of S.H. was "lawful" and that DHS custody was "warranted." *Id.* at 581. He explained to Plaintiffs:

> To the parents, I'm sorry for your loss. This hearing is for a very simple purpose, to decide whether the State acted appropriately upon the information that they received. They did, in my opinion, by taking the child into custody. That has nothing to do necessarily with who has injured your child. Okay? Or actually in the – which led to, you know, [J.R.H.] passing.
>
> . . . [W]e don't know what happened. Nobody knows yet what happened to [J.R.H.], and because of that, the State did act appropriately in taking [S.H.] into custody while an investigation is going on.

*Id.* The referee entered an order finding "reasonable suspicion that S.H." needed "immediate protection due to abuse or neglect." *Id.* at 413.

5

On March 15, Whitaker issued her completed report; Washington reviewed and signed it. The report included Baum's statement that neither she nor Dr. Stuemky thought that Plaintiffs caused J.R.H.'s skull fracture, but it did not refer to Dr. Allen's statement. Whitaker recommended that the ADA file a deprived-child petition, and the ADA did so.

Two months later, authorities returned S.H. to Plaintiffs. An order entered at the time stated that "DHS . . . agree[s] that child should be returned home. All medical evidence indicates that child died at babysitters and that parents were not responsible." *Id.* at 414. An Oklahoma state court dismissed the deprived-child action on July 26, 2011. Although the medical examiner's autopsy report found that J.R.H.'s death was a homicide, no charges have been filed with respect to the infant's death.

## B. Court Proceedings

In March 2013, Plaintiffs filed their suit in Oklahoma state court, but it was then removed to federal court. After a series of motions to dismiss and amendments to the complaint, Plaintiffs filed on January 10, 2014, their Second Amended Complaint (the Complaint), which is the operative pleading for this appeal. It alleges (1) a negligence/wrongful-death claim against Kramer; (2) a state and federal civil-rights claim against Leitch, Whitaker, and Washington; (3) a vicarious-liability claim against the City of Edmond and DHS for violation of Article 2, § 30 of the Oklahoma Constitution; and (4) a claim under 42 U.S.C. § 1983 against Leitch, Whitaker, and Washington for malicious prosecution. On motions filed by the defendants, the district court dismissed the claims against Leitch, DHS, and the City of Edmond in April 2014, but it denied the

6

motions of Kramer, Whitaker, and Washington.  On May 8, 2014, the district court entered a scheduling order, which provided, among other things, that any motions to amend the pleadings be filed within 30 days of the order.

On February 23, 2015, Kramer filed a notice of bankruptcy, thereby staying the litigation against her.  *See* 11 U.S.C. § 362(a).  Plaintiffs sought relief from the stay in bankruptcy court so they could pursue their litigation.  In June the bankruptcy court modified the stay to let "[Plaintiffs] . . . attempt to amend their complaint in [this litigation] to add a willful and malicious tort claim or otherwise obtain a determination that the complaint already states such a claim."  *Id.* at 162; *see* 11 U.S.C. § 523(a)(6) (" A discharge [in bankruptcy]. . . does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity.").

As a result, Plaintiffs moved the district court on July 2 to (1) determine that the Complaint "state[d] a claim that [Kramer] intentionally and maliciously" caused J.R.H.'s death, or, in the alternative, (2) grant Plaintiffs leave to amend their complaint to add intent-related material.  *Id.* at 173.  In September 2015 the district court denied Plaintiffs' motion.  After holding that the Complaint "[does] not allege a willful and malicious tort claim against defendant Kramer," *id.* at 301, it denied Plaintiffs leave to amend, finding that they had unduly delayed making the relevant amendments because they had "a basis for a willful and malicious tort claim more than two years before the lawsuit was filed," *id.* at 299.

In May 2016, Whitaker and Washington moved for summary judgment on all remaining claims.  The district court granted their motion.  It then entered a final

7

judgment under Fed. R. Civ. P. 54(b) "as to all claims except for [P]laintiffs' negligence claim against . . . Kramer, which is stayed in bankruptcy." *Id.* at 435.  Plaintiffs appealed the district court's rulings rejecting their contention that the complaint alleged a willful and malicious act by Kramer, denying leave to amend, granting summary judgment to Whitaker and Washington, and dismissing the claim against DHS.

## II.    DISCUSSION

### A.    Claims against Kramer

#### 1.  Adequacy of the Complaint

Plaintiffs contend that the Complaint adequately alleges a claim that Kramer committed a willful and malicious tort.  We agree with the district court that it does not.  To begin with, the claim does not even purport to do so.  The title of the claim is: "CLAIM FOR RELIEF AGAINST DEFENDANT, TRACI D.  KRAMER – NEGLIGENCE/WRONGFUL DEATH."  Aplt. App., Vol. 1 at 23.  The district court aptly described the core paragraph of the claim against Kramer as expressing the "classic elements of a negligence claim." *Id.* at 295.  The paragraph states:

> Defendant Traci D. Kramer owed J.R.H., deceased, a duty to provide him adequate supervision and to take reasonable steps to protect him from harm. Defendant Traci D. Kramer breached that duty and as a result of the breach of that duty, J.R.H. suffered severe bodily injury and ultimately died as a result.

*Id.* at 23 ¶ 4.  The adjacent paragraphs explicitly speak in terms of negligence.  Paragraph 3 invokes res ipsa loquitur, saying that the death of J.R.H. "would not ordinarily occur in the absence of negligence on the part of [Kramer]." *Id.* at ¶ 3.  And paragraph 5 alleges various harms that occurred "[a]s a further result of Defendant Traci D. Kramer's

8

negligence." *Id.* at 23 ¶ 5. Notably absent from the pleading is *any* allegation of Kramer's willfulness, maliciousness, or intent.

Plaintiffs point to their prayer for relief, which states that they "may also seek punitive damages against each defendant." *Id.* at 32. But this prayer cannot help them. First, "the prayer for relief is no part of the cause of action." *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 901 (10th Cir. 2011). Second, even the prayer paragraph itself contains no allegation of scienter.[1] It is indisputable that the Complaint does not state a claim for a willful and malicious tort by Kramer.

## 2. Denial of Leave to Amend

Plaintiffs' fallback argument is that the district court abused its discretion by denying leave to amend the complaint under Fed. R. Civ. P. 15 to allege willful and malicious conduct by Kramer. We review for abuse of discretion a denial of leave to amend, mindful of "Rule 15's command to grant leave to amend 'freely . . . when justice so requires.'" *Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 789 (10th Cir. 2013). Plaintiffs focus much of their argument on the alleged lack of prejudice to Kramer if an amendment were allowed. But as the district court properly recognized, the Supreme Court has identified "undue delay" as a proper justification for denying a motion to

---

[1] We also note that punitive damages can be awarded in Oklahoma even if the defendant's conduct is not willful and malicious. Punitive damages up to the greater of $100,000 or actual damages can be awarded if "[t]he defendant has been guilty of reckless disregard for the rights of others." Okla. Stat. tit. 23, § 9.1(B)(1)(a)-(b). If, however, "[t]he defendant has acted intentionally and with malice towards others," the jury may award damages up to the greater of $500,000, twice the actual damages awarded, or the increased financial benefit derived by the defendant from its conduct. *Id.* § 9.1(C)(1)(a)-(c).

amend. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see Duncan v. Manager, Dept. of Safety, City & Cty. Of Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005) ("In the Tenth Circuit, untimeliness alone is an adequate reason to refuse leave to amend."). Delay is undue "when the party filing the motion has no adequate explanation for the delay." *Zisumbo v. Ogden Regional Med. Ctr.*, 801 F.3d 1185, 1195 (10th Cir. 2015) (internal quotation marks omitted).

In this case the district court's initial scheduling order had set the deadline for motions to amend the pleadings as June 7, 2014, more than eight months before Kramer filed for bankruptcy and almost 13 months before Plaintiffs moved to amend their complaint. Yet Plaintiffs have not offered an adequate explanation why they could not have added the new allegations years earlier. In particular, Plaintiffs do not dispute Kramer's claim that in May 2011 their attorney sent Kramer's attorney the autopsy report for J.R.H., which stated the manner and cause of his death as "homicide" caused by "blunt force head trauma." Aplt. App., Vol. 1 at 214. And in November 2011, Plaintiff Leah Hedger was quoted in a newspaper article as saying that her son "ha[d] been murdered." Aplt. App., Vol. 1 at 258. The Plaintiffs provide no explanation for why, despite believing that their child was murdered, they delayed so long in alleging that Kramer acted intentionally.

At oral argument in this court, Plaintiffs' counsel offered only one item of evidence of intent that had not been available much earlier: Kramer's invocation of her privilege against self-incrimination in her January 26, 2015 response to interrogatories about how the infant had been injured. (She apparently also invoked the privilege again

10

at the bankruptcy-court creditors' meeting and at a later deposition.)  But it is hardly clear why a claim of willful and malicious conduct became viable only upon Kramer's refusal to testify.

Further, Plaintiffs' prayer for punitive damages cuts against any claim of diligence.  Despite pleading from the outset that they may seek punitive damages against Kramer (and other defendants), they never pursued such relief by seeking to amend their complaint to allege Kramer's scienter.

We hold that the district court did not abuse its discretion in denying the motion to amend.

## B.  Claims against Whitaker, Washington, and DHS

Plaintiffs also challenge the district court's grant of judgment to Defendants Whitaker, Washington, and DHS.  Two of the claims asserted by Plaintiffs—their malicious-prosecution claim and their Fourteenth Amendment substantive-due-process claim alleging interference with familial relationships—are directed at Whitaker and Washington only.  The final claim, a wrongful-seizure claim under the Oklahoma constitution's version of the Fourth Amendment, is directed at Whitaker, Washington, and DHS.

We can readily dispose of the familial-relationship claim, because Plaintiffs have not responded on appeal to the invocation by Whitaker and Washington of their defense of qualified immunity.  They raised that defense in their motion for summary judgment and in their brief on appeal.  Once that defense is invoked, a plaintiff must demonstrate both that the defendant committed a substantive violation of a federal constitutional or

11

statutory right, and "that the right was clearly established at the time of the defendant's unlawful conduct." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (internal quotation marks omitted).  To demonstrate that the law is clearly established, a plaintiff must "point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (internal quotation marks omitted).  The failure to identify such a case is fatal to the claim.  S*ee id.* at 902; *Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013).  Because Plaintiffs' briefs on appeal not only fail to identify such a case but do not even mention qualified immunity, we must affirm the dismissal of this claim.

Plaintiffs' remaining two claims both fail on the merits for essentially the same reason.  We first address their claim against Whitaker, Washington, and DHS for wrongful seizure in violation of the state constitution.  Article 2, § 30 of the Oklahoma Constitution closely tracks the Fourth Amendment.  It states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, describing as particularly as may be the place to be searched and the person or thing to be seized.

As we understand the claim, Plaintiffs contend that their older son was wrongfully seized without probable cause because Whitaker failed to advise the court or the law-enforcement officers who originally picked up the child that treating physicians had said that they did not believe that Plaintiffs had inflicted the injury on the baby.  This contention, however, is based on a misconception about the law governing removal of children from their parents.  Parents not only must not inflict harm themselves, but they

12

must protect children from harm by others. *See* Okla. Stat. tit. 10A, § 1-4-904(B)(9) (allowing for termination of parental rights based on a finding that "the parent has . . . failed to protect the child or a sibling of the child from abuse or neglect that is heinous or shocking"); *In re C.L.D.*, 238 P.3d 966, 970 (Okla. Civ. App. 2010) (affirming transfer of custody over child to grandparents where "[t]he issues before the district court involved not only Father's past conduct, but also whether, in the future, he would be able to provide that level of care and protection needed by the child"); *In re T.H.*, 105 P.3d 354, 357 (Okla. Civ. App. 2005) (rejecting mother's argument that a district court's finding terminating her parental rights was in error when she was not present at the time of the abuse because "[Oklahoma law] provides that parental rights may be terminated for *failure to protect* a child from heinous and shocking abuse"). In light of this law, there would have been more than adequate grounds for removal of the older child even if Whitaker had disclosed Dr. Allen's exculpatory statement. Over a period of a few weeks in his young life, J.R.H. had suffered repeated injuries, including a fractured arm/shoulder, a noteworthy bruise on his head, and the fatal skull fracture, yet no one had identified how any of the injuries occurred. Even assuming that Plaintiffs had not inflicted any harm themselves, these significant injuries provided probable cause to believe that they had failed to protect the child. Accordingly, Whitaker did not cause an unlawful seizure, and neither did Washington. And because the Complaint rests the liability of DHS solely on the conduct of Whitaker and Washington under the doctrine of respondeat superior, the claim against DHS must fail as well. *See Hooper v. Clements Food Co.*, 694 P.2d 943, 945 (Okla. 1985) ("Under respondeat superior, the negligence or

13

wrongful act . . . is imputed to the master.  Thus, a finding of no negligence on the part of the servant, conclusively negates the liability of the master." (emphasis omitted)).

Plaintiffs' malicious-prosecution claim fails for the same reason.  To maintain their malicious-prosecution claim under 42 U.S.C. § 1983, Plaintiffs "must show:  (1) the defendant caused the plaintiff's confinement or prosecution; (2) the original action terminated in the plaintiff's favor; (3) *there was no probable cause* to confine or prosecute the plaintiff; (4) malice; and (5) damages."   *Cordova v. City of Albuquerque*, 816 F.3d 645, 650 (10th Cir. 2016) (emphasis added).  The claim fails on the third prong because, as discussed above, even if Whitaker had disclosed the allegedly exculpatory statements, there was clearly probable cause to institute proceedings to seize S.H.  Accordingly, the district court's grant of summary judgment on this claim was proper.

Because of our disposition of all the claims before us, we need not address the defendants' additional arguments for affirmance.

### III.    CONCLUSION

We **AFFIRM** the district court's denial of Plaintiffs' motion to amend their complaint.  We also **AFFIRM** the district court's judgment in favor of Defendants Whitaker, Washington, and DHS.

Entered for the Court


Harris L Hartz
Circuit Judge

14